## FREENEY v. THE STATE.

1. In the light of the note appended by the presiding judge to the first ground of the amended motion for a new trial, the mode of summoning tales jurors will not require a new trial.

2. From a note of the presiding judge it appears that one of the contentions of the State was that the person who was slain had an interest in the house where the accused woman lived, and went there to collect his rent or to see about it; that this was controverted by the defendant, who claimed that the deceased had no interest in the house and that no rent was due at the time of the homicide; that in making her statement the accused referred to certain receipts given to her for rent, and exhibited them; that her counsel told her to hand them to the jury, which she did; that, after the jury had examined them and handed them back, the solicitor-general requested the official stenographer to mark them for identification, which was done; that later, when a witness for the State was being cross-examined, counsel for the accused handed to the witness a rent receipt and proved its execution by him, and then said (referring to the receipt), "We offer that with the others; they are already in evidence;" to which the solicitor-general replied, "All right." *Held,* that this showed that evidence was intro-

duced on behalf of the accused; and her counsel were not entitled to the opening and conclusion of the argument.

3. Where evidence has been introduced on behalf of the accused, and heard or examined by the jury, and counsel for the State therefore has the opening and conclusion of the argument, counsel for the accused can not, as matter of right, withdraw the evidence and thus regain the right to open and conclude.

4. Section 72 of the Penal Code provides that "If after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended, or might accrue to the person, property, or family of the person killing." *Held,* that the words, "a serious injury," in this section are not limited to a felony.

5. As to whether the charge of the court on this subject requires a reversal or not, the Justices of this court are equally divided in opinion. On this question, therefore, the judgment is affirmed by operation of law. On all other questions the court is unanimously of the opinion that no reversal is required.

6. None of the other grounds of the motion for a new trial require a reversal.

Argued October 24,—Decided December 21, 1907.

Indictment for murder. Before Judge Martin. Dodge superior court. July 16, 1907.

It is unnecessary to report the facts further than they are set out in the opinion, except to give the material portions of the prisoner's statement, as follows: "I married the first time Jesse Rogers, who was over fifty years of age, father of Sheriff Rogers. He was cruel and unkind to me. He shot at me and beat me, leaving knots on my head. We could not get along. I had one child by him, named Lueva, who since married a man by the name of Martin. I worked hard in the house and in the field, and even taken the plow to try to make a living, and it seemed that I could not have anything. We separated, and he taken everything that I had worked for, and I was sick and not able to work, and George Freeney came to see me and told me that he would take care of me and work for me, and we would marry as soon as I got my divorce. It was about two years before the divorce, and that time I had my baby there. But I have been living just as near right as I knew how, and would pray and ask the Lord to help me. . . He came down just before dark and knocked

at the door.  I went out and said, 'Good evening, Mr. Har-
rell.' He said, 'How are you getting along, Mrs. Freeney?' I
said, 'I am well, I thank you, how are you?' He said he was all
right.  Just the very way he said it.  He said, 'I am all right.'
I told him to have a seat.  He said he didn't care to sit down,
and started to push in by me.  I had hold of the bolt of the door
and he started to push in by me.  I told him to go in the boy's
room, that my room had not been cleaned up all day, and not to
go in there, that my cook was sick and I had not had time to
clean up the room—which everybody in the whole country know
I was run to death all the time.  He said, 'You need not get mad,
nor fuss, nor rear, but I am going to sleep with you before I leave
here.'  I says, 'Why, Mr. Harrell, what is the matter with you?'
He said, 'I have got as much money as anybody, and you can
get it,' and grabbed hold of my arm there.  I jerked away from
him, and thanked him, I didn't want a cent of his money.  If I
did I would go to him like a lady and ask him for it and pay it
back to him.  I says, 'Are you drunk, crazy, or sober, or what is
the matter?'  He said, he was as sober as I was.  I says, 'Well,
you go home to your wife and children.'  I says, 'If I had time I
would go to your wife and tell her right now.'  I says, 'Now you
had better go on and let me alone.'  I says, 'Please get out of
here.'  He walked on out, and I heard him say at the gate—
I was standing in the door—I heard him say at the gate, that my
wife and children go to hell.  I started back into the kitchen.
It was getting late, and I hadn't fixed supper.  He opened the
door and started in my room.  I turned around and says, "Didn't
I tell you to go on and let me alone?' just like I was talking to
any one.  I was not mad a bit, but my feelings were hurt.  He
says, 'I told you, God damn you.' (that is the very way he spoke)
'that I was going to sleep with you.  If you don't sleep with me,
I will blow your head off or run you out of town.'  I said, 'I
will see,' and started out for an officer.  He was standing in my
front room door.  I started out.  When I did, he hit me right in
the breast, just as hard as he could drive me, and made an awful
wound on my breast.  For a week, I could hardly get breath.  I
started out at the other kitchen door, and he told me that if I
didn't come back, he would blow my head off, and 'I have a pistol
to do it with.'  I knew he always toted a pistol in the country, be-

cause when he would come to the house he would give it to Mr.
Freeney, and Mr. Freeney would put it away. He would not let
me out of the front door or the back door. I didn't know what
else to do. I could not let him take me and let him shoot me
down. I knew something was wrong. He was either drunk or
crazy one, or he would not have come down there and approached
me in any such way as he did, because he had been to my house
a whole lot, and always treated me just as kind as if he had been
a brother of mine. I went back to the bed. When I went to
the bed he stepped inside. I run there as quick as I could,
raised a corner of the mattress and got my pistol, and got between
the doors and he was in my front door and I shot at him. He
stepped out back on the veranda and threw his hand back of him
and stooped over, acted as I thought he was drunk, and didn't
know where his pistol was. I am satisfied he was drunk. When
he threw his hand back, I knew I had to do something. I
shot at him again. He turned around and walked out to the
corner and fell. I didn't know whether I had hit him or
not. As soon as I shot the next time and he started out the
door, I went back to the bed and put my pistol under there, and
went right on to the door. I was kinder frightened. I didn't
know hardly how I did feel. I didn't know but what he was
gone home. When I got to the door, I looked and didn't see him
anywhere. I went up to the other end of the porch and came
back to this end. When I got there he was lying there. It was
just like Mr. Andrews' boy said. He was the first one there. He
saw me shoot. I told him I did it. Mr. Harrell came down
there and insulted me and struck me, and I told him I could not
take everything because I was a poor woman, and had nobody to
protect me. It was too bad, and the crowd came and didn't give
me time to say anything. . . Mr. Harrell thought he would
make me yield to him because I thought he had plenty of money
and friends, and because I was just a poor woman and didn't
have any one to protect me, and without money, just working for
what I eat, that he would take the advantage of me. My breast
was bruised clean through and through back to my shoulder blade.
. . I just could not stand there right in the house tired and
worked down and let a man, because he was strong, come in and
beat me around and threaten to shoot me twice before I ever done

anything. I talked to him just as kind as I ever did to anybody, and [could not?] stand there and let him kill me."

*DeLacy & Bishop, John R. Cooper,* and *C. T. Atwell,* for plaintiff in error. *John C. Hart, attorney-general, E. D. Graham, solicitor-general,* and *C. W. Griffin,* contra.

LUMPKIN, J. Mrs. Sallie Freeney was indicted for the murder of W. P. Harrell, committed by shooting him with a pistol. She was convicted and recommended to be imprisoned for life. She moved for a new trial, which was refused, and she excepted.

1. Of the twenty-one grounds which make up the original and amended motion for a new trial only a few require special mention. Several of them consist of long colloquies between the court and counsel, followed by explanatory notes by the court; which altogether make no very exact and clear-cut point. Of this character was the first ground of the amended motion, which complained that the court committed error, after the regular panel of jurors had been exhausted, in not drawing the rest of the jury from the jury-box, at the request of defendant's counsel, instead of ordering the sheriff, who was active in the prosecution, to summon tales jurors in and about the court-room and in the city of Eastman, where the trial took place. Attached to this statement is a copy of argumentative statements by counsel on both sides, and answers of the deputy sheriff to questions put to him, covering nearly two typewritten pages, and followed by a note of the presiding judge, covering a third page. From these it may be gathered that no objection was made to the jurors who were summoned, nor any challenge; that no proof was offered to show that the sheriff was unfriendly to the defendant or was in any way engaged in assisting the prosecution; that he was related to the defendant by marriage, but was sick at home, and took no part in summoning the jurors, and this was done by a deputy under special instructions from the court; that the son of the sheriff was a bailiff, but was not present when the jury was secured, and had nothing to do with the matter; and that no request was made to draw the names of additional jurors from the box "until after the jury sworn and canvassed had been exhausted," when the request was made, but was refused because citizens from all parts of the county were in the court-room and in the town, and to stop and draw tales jurors and send to remote parts of the county to serve them would

have involved a delay of a day or two. Apparently the relationship of the sheriff to the defendant, without any proof of ill feeling toward her, would be favorable to her, rather than otherwise. See *Downing* v. *State,* 114 *Ga.* 30 (39 S. E. 927). But if there was anything presumptively injurious to the defendant, the sting was drawn by the judge's note.

2, 3. One ground of the motion for a new trial contended that the court improperly ruled that counsel for the State were entitled to the opening and conclusion of the argument. Counsel for the accused claimed that no evidence had been introduced in her behalf, and that certain rent receipts were merely referred to by her in her statement and exhibited by her and handed to the jury, but not introduced in evidence. Counsel for the State contended that the receipts were introduced in evidence, and that the right of opening and concluding the argument on behalf of the accused was thereby lost. The court sustained this position. Counsel for the accused then asked leave to withdraw the receipts from evidence, if they were held to have been introduced. The court ruled that they could withdraw the evidence, but could not thereby regain the right to open and conclude the argument.

The right to open and conclude the argument in a criminal case is an important right. If it be improperly denied, this furnishes ground for a new trial. In criminal trials the accused has a right to make to the court and jury a statement not under oath. Counsel for the defendant have the right to comment upon the statement so made. It was held in *Nero* v. *State,* 126 *Ga.* 554 (55 S. E. 404), that the statement can not properly be made the vehicle for the introduction of documentary evidence, which should be formally offered; and that the presiding judge could decline to allow such documents to be read to the jury by the accused. In *Nobles* v. *State,* 127 *Ga.* 212 (56 S. E. 125), the accused, while making a statement, used for the purpose of illustration a map which he held in his hand, but it was not introduced in evidence. The majority of this court held that the presiding judge did not err in refusing to allow counsel for the defendant to make use of the map during his argument. The writer of this opinion dissented. See also *Crawford* v. *State,* 117 *Ga.* 247 (5), (43 S. E. 762). If it were clear that the rent receipts which formed the subject of the ruling in regard to the opening and conclusion of

the argument were merely read by the defendant as a part of her statement, without objection from counsel or ruling thereon by the court, and were not introduced in evidence, the writer would be strongly of the opinion that this would not have affected the right of her counsel to open and conclude the argument. But the exact question is, whether, under what transpired, as appears in the ground of the motion for a new trial and the note appended thereto, these receipts were simply read or spoken of in the defendant's statement, or were introduced in evidence. On this subject the court added a note containing the following: "One of the contentions of the State was that W. P. Harrell had an interest in the house where Mrs. Freeney lived, and went there to collect his rent or see about it. This contention was controverted by the defendant, who claimed that Harrell had no interest in the house and that there was no rent due until March 25th, and that Harrell was killed on the 9th of March. Mrs. Freeney while on the stand referred in her statement to the receipts given for rents and exhibited them, when her counsel told her to hand them to the jury, and she did so, and after the jury had examined them and handed them back, then the solicitor-general requested the stenographer to mark them for identification. When Mr. Bowen, from whom Mrs. Freeney claimed the house was rented and who had been paid the rent by her, took the stand and was being cross-examined by Mr. DeLacy, who was conducting the examination for the defendant, Mr. DeLacy handed Bowen one of the receipts and put the following question: Q. 'Did you make that receipt?' Ans. 'Yes, sir.' Q. 'That covered the 9th of March, the day he was killed, did it not—from February 25th to March 25th?' Ans. 'No. sir. February 25th to whatever day this was.' Q. 'When did you collect?' Ans. 'This is the 18th of March. I got it after Mrs. Freeney was in jail.' Immediately after this answer, which was the last one made by the witness, Mr. DeLacy said, referring to the receipt on which Bowen had been examined, 'We offer that with the others. They are already in evidence.' To this remark of Mr. DeLacy the solicitor-general replied, 'All right.'"

Under this statement from the court, the defendant did introduce evidence, and thus lost the right to the opening and conclusion of the argument. It is said that the receipts are not in the brief of evidence, and that this shows that they were not introduced.

They are briefly described at the close of the statement. The court refused to allow the evidence to be withdrawn so as to give the defendant the right to the opening and conclusion. This was not error, under the case of *Zipperer* v. *Mayor and Aldermen of Savannah,* 128 *Ga.* 135 (57 S. E. 311). While in this case the effort to withdraw was doubtless made in entire good faith (and we do not mean to intimate anything to the contrary), yet the establishment of a rule that the defendant has the right to introduce evidence and afterwards withdraw it and claim the opening and conclusion of the argument might lead to a situation not contemplated by the statute. Suppose that the defendant in a criminal case should introduce all the evidence, oral and documentary, which he could obtain, but the State should introduce evidence overwhelmingly rebutting and disproving it, if the rule suggested were adopted, upon finding that the evidence would probably not avail him, he might, just before the beginning of the argument, announce that his evidence was withdrawn and claim the conclusion of the argument. Thus he might experiment by introducing evidence, and securing such impression as it might make on the jury, and still retain the option to return to the position of having introduced no evidence and thereby securing the advantage of the opening and conclusion in the argument.

4, 5. It is often said that every man's house is his castle. In early days men were compelled to protect themselves in their habitations by preparing them against attacks; and thus in time the dwelling came to be known as the dweller's castle, the name probably having its origin in feudal times. If attacked in his home, he did not have to retreat, but could use necessary force to eject the intruder. It was not lawful to kill for a bare trespass on property. It must have been at least forcible. The exact character of invasion which would authorize a killing under the common law has brought out different expressions. In some cases it was stated that the owner of the dwelling could resist a forcible entry therein by force, but had no right to kill the trespasser unless necessary to prevent the commission of a felony on his person or property, or on the person of some one under his protection in the house. In others the words "serious injury" were also used. State *v.* Taylor, 143 Mo. 150 (44 S. W. 785) ; 1 Bish. Cr. L. (8th ed.) §859; Young *v.* State of Nebraska (Neb.), 104 N. W. 867, 2 L.

R. A. (N. S.) 66, and note; Askew v. State, 94 Ala. 4 (10 So. 657, 33 Am. St. R. 83, and note) ; Carroll v. State, 23 Ala. 28 (58 Am. Dec. 282) ; Note to State v. Summer, 55 S. C. 32 (32 S. E. 771, 74 Am. St. R. 707, 726-730) ; State v. Patterson, 45 Vt. 308 (12 Am. R. 200, and note) ; Allen v. State (Tex. Cr. App.), 66 S. W. 670; Clark's Cr. Law (2d ed.)., 170; Archbold's Cr. Pl. & Pr. 796, and note. In the Penal Code enacted by the legislature in 1833 occurs the section which is now codified as section 72 of the present Penal Code. It reads as follows: "If after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended, or might accrue to the person, property, or family of the person killing." In section 70 it had been provided that it would be justifiable homicide to slay in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either. Under that section, persuasion, remonstrance,. or gentle means are not declared to be first required. Section 72, quoted above, has reference to forcible attacks and invasions of property or habitation. In such cases, if gentle measures will not avail, homicide becomes justifiable, provided such killing is absolutely necessary to prevent such attack and invasion, and that a serious injury is intended, or might accrue to the person, property, or family of the person killing. If this section meant that the injury must necessarily amount to a felony, it would require more forbearance and precaution to justify defense of person or property in an attack upon one's own home than anywhere else. Such is not the meaning of the statute.

In *Pound* v. *State*, 43 *Ga*. 88, 136, it was said that the section under review (then numbered 4266) applied only to the defense given to a person in protecting his habitation, or property, or family, or himself, while in such place, from forcible attack. Some doubt as to this was afterwards expressed. (*Crawford* v. *State*, '90 *Ga*. 701, 17 S. E. 628, 35 Am. St. R. 242) ; but we think it is sound. The property concerned in the *Crawford* case was meat

which was being hauled on a wagon traveling along the road; and what was said as to the necessity for the crime to be a felony had reference to the case before the court, not to a question of forcible attack and invasion of the habitation. In *Pound's* case, 43 *Ga.* 135, supra, it was said that the section (now 72 of the Penal Code) "classes another line of defense after remonstrance. Such forcible attack may not comprehend felony, but serious injury." This was said in the opinion in discussing the two sections above mentioned. See, on the general subject, *Horton* v. *State,* 110 *Ga.* 739, 743 (35 S. E. 659); *Palmour* v. *State,* 116 *Ga.* 269, 271 (42 S. E. 512). And compare (on section 70, as to riotous and tumultuous entry by two or more) *Smith* v. *State,* 106 *Ga.* 673, 682 (32 S. E. 851, 71 Am. St. R. 286). It must be carefully borne in mind that this does not give a free license to kill for slight provocation. It must appear that such killing was absolutely necessary to prevent the forcible attack and invasion, and that a serious injury was intended or might accrue to the person, property, or family of the slayer. No exact definition of the words "serious injury," as used in this statute, has been made. Clearly it does not authorize the taking of human life because of every mere trespass upon property, or because of mere insulting words. In *Nix* v. *State,* 120 *Ga.* 163 (47 S. E. 516), Mr. Justice Cobb said: "It may be that a case might arise where a trespass upon property would be of such a grave nature as to amount to a serious injury within the meaning of the section; in other words, that a trespass in its nature, gravity, and consequences would be such that the law might authorize the taking of human life to prevent its commission. But such a condition of affairs would be of rare occurrence in the transaction of human affairs, and certainly would not arise out of one of the ordinary and every-day quarrels about property rights." The threatened injury must be grave in its character and consequences. Human habitation is sacred, but so likewise is human life; and the necessity for slaying and the seriousness of the impending injury to person, property, or family must concur to render the homicide justifiable, under this section of the Penal Code, after gentle measures to prevent the forcible attack and invasion have been used.

It being error, as an abstract proposition, to charge that the serious injury referred to in this statute must amount to a felony,

was this error such as to require a reversal in the present case? On this point the Justices of this court are equally divided in opinion. Justices Beck, Atkinson, and Holden entertain the view which may be thus stated: The statement of the accused, if accepted by the jury, would have authorized a finding that there was a forcible attack and invasion on her habitation, and that a serious injury was intended or might have accrued, which did not amount to a felony; and therefore an error in charging on that subject was material, and should require a new trial. The view of Chief Justice Fish and Justices Evans and Lumpkin may be thus stated: No theory of forcible attack and invasion upon the habitation of the accused can arise out of the evidence; and it is exceedingly doubtful if any such theory can be properly derived from the statement of the accused. It would seem to make rather a case of attack upon her person than upon her habitation. If such a theory can arise from the statement, and it be accepted by the jury, the facts which she stated make a case of an effort by the deceased to commit a felony on her (rape, homicide, or shooting at another) and raise no theory of "a serious injury" less than a felony. The charge, therefore, could not have injured her. The court charged fully on the law of voluntary manslaughter (including provocation by assault), and the law of self-defense and of defense of person and property against one who attempts by violence or surprise to commit a felony on either, and the law of reasonable fears. The accused had the full benefit of every theory in her case; and the inaccuracy in regard to section 72 furnishes no ground for a reversal.

6. The remaining grounds of the motion for a new trial do not require special mention. Some of them complain of a failure to give certain charges; but the presiding judge certified that no written requests to give them were made. Some of the grounds complain of charges which in themselves were correct; others of charges which, when considered in connection with the notes of the presiding judge and the entire charge of the court, were not such as to require a reversal. Some complain of the admission of evidence, without setting out the evidence itself. One complains of the testimony of a named witness (without stating what it was), that it was admitted over objection by the defendant "upon the ground that she had been previously examined." It would

serve no good purpose to take up each of these grounds and show wherein it is deficient in itself, or is explained by the note of the court, or that it is not error for the reason assigned, or that, when taken in connection with the charge as a whole, it is not of such a character as to necessitate a new trial. Without pronouncing the charge or rulings perfect in all respects, if there were any other inaccuracies, they do not require a new trial.

*Judgment affirmed.*