1. One can not successfully invoke the provisions of the Code, § 26-1013, unless there is both a "forcible attack and invasion" of the habitation, and unless also the accused before taking the life of another resorts to "persuasion, remonstrance, or other general measures" to prevent such attack and invasion. And it is not error for the court to fail to charge this section where the evidence fails to show such essentials.
2. If there be the slightest doubt under the evidence as to whether the offense was murder or voluntary manslaughter, it is the duty of the court to instruct the jury as to the law of both of these offenses. Then it is up to the jury alone to determine, under the law thus given and the evidence, which, if either, of the offenses has been committed.
3. There is no reversible error in special ground 3. *Page 675 
4. Special ground 4 is but an elaboration of special ground 1, and is controlled by what we have said concerning that ground.
5. The evidence sustains the verdict.
 DECIDED JANUARY 9, 1947.
J. I. Bracewell was convicted of voluntary manslaughter. The jury fixed his punishment at not less than two nor more than five years. He filed an amended motion for a new trial which was overruled. On this judgment he assigns error. Generally and briefly the evidence reveals that the defendant and the deceased, Graham Edenfield, lived in the same community. They had never had any difficulty before. They were related by marriage. In the afternoon preceding the homicide, which occurred around midnight, the deceased and the defendant left the defendant's home in the deceased's car. At the instance of the deceased, a shotgun and pistol which belonged to the defendant were put into the automobile. These two persons proceeded to a sawmill, then to Broxton, Georgia, and returned to the community in which they lived, it then being about dark. During this ride and association both the defendant and the deceased drank considerably. They became enraged at each other and engaged in hot words and one or more personal difficulties. The defendant, in the presence of some of the witnesses, accused the deceased of stealing his shotgun and pistol. The deceased with a shotgun, and that it was necessary for the deceased to grab the gun of the defendant. They separated. The defendant borrowed a shotgun to carry home with him ostensibly for his protection against the deceased. The deceased likewise borrowed a shotgun and left the defendant's shotgun which he had possessed at the home of a witness. From the time that the defendant and the deceased parted company in the late afternoon or early evening, each made threats against the other to the effect that each would kill the other. They did not, however, come in contact with each other until four or five hours thereafter, at the scene of the homicide. From the evidence it appears that after these threats, none of which was communicated to the other person, both the deceased and the defendant had promised to leave the friction between them until the next day. The deceased shortly before the homicide left ostensibly for his home. The defendant left in the same general *Page 676 
direction towards where the deceased lived. The defendant lived between where the deceased left and the home of the deceased. The defendant did not live immediately on the main public road leading to the home of the deceased, but it was necessary to turn off of that road a short distance in order to go by the defendant's home. It was about one-quarter of a mile farther to the home of the deceased if one traveled by the home of the defendant. The deceased, going in the direction of his home, went by the defendant's home. There were no eyewitnesses to the homicide except the defendant and his wife. The first person to reach the scene of the homicide was a Mr. Cliett, on whose place the deceased lived. The deceased's wife prevailed upon Mr. Cliett to go to the defendant's home on account of the trouble between them. It seems that no one heard the gun fire. When Cliett arrived immediately in front of the defendant's house, he found the deceased's car in the road and the deceased dead, lying on the opposite side of the car from the house with his feet toward the back of the car, a shotgun lying a few feet from his body with a buckshot shell which was not discharged, and the gun unbreached. The deceased had 74 wounds on his person. Most of them were in a place which the witness indicated but the location is not shown in the record, two in the chin and one on his forehead. The deceased also had on his person the pistol which belonged to the defendant. It does not appear whether the pistol was loaded or not. Several hours prior to that time, under some of the evidence, the deceased had unloaded the pistol and given the cartridges to someone else. The body of the deceased was lying thirteen steps from the point where the defendant claimed to have shot him. When Mr. Cliett arrived, the defendant freely and voluntarily said to him, "Uncle Burt, I killed him.' He said he hated he killed him, but he had to — he was coming around the car on him. I asked him what he killed him with. He said, `I killed him with a gun — Charlie Wooten's shotgun.'" The defendant in his statement on the trial, after having related the itinerary and difficulties of himself and the deceased on the afternoon prior to the homicide, stated: "I was sitting there eating supper, and she picked up the lamp for us to go in the house — my wife did — and Graham [the deceased], he drove up in front of my gate and called me. Well, I wouldn't go out. My wife says she would go out there and try to persuade him to go home. I could see him sometime *Page 677 
next morning. And I told her that I didn't want to trouble out of him, and for her to go out there and tell him to go on home. She went out there and began to beg him to go home, and he just began to cuss. You could hear him ever so far up there. Well, I was standing just inside of my front door looking at him. I could see him. He told her he was going in there and kill me, God damn it, anyhow. She told him, `No,' not to go in the house and go to shooting; and the young'n had woke up and come there where I was standing at the door; and he told her to shut her God damn mouth two or three times, and he meant it. Well, I walks out on the porch just about a good step or two outside of my front door. Well, my young'n went with me, standing with me. He could see me after I had went out on the porch and my wife seen him unbreech the gun and breech it back, and she hollered and told me, `Look out, Graham is coming in there with a gun, and it is loaded.' He had got out of the car then. So he got out and shut his car door. He was shutting the car door. I spoke to him and asked him not to cuss my wife that way. So I was standing there with my gun holding it with one hand, and my little boy standing there with me, and when I spoke and asked him to go on home and not cuss at my wife that way, he turned around; his back was to the front of the car, and he turned around and stepped out about that far past his windshield (indicating), and he looked right at me standing on the porch, and he told me — he was holding his gun that way (illustrating) — he says: `I will kill you, you God damn bastard and son of a bitch,' and went to raising that gun on me, and when he did, then I had to shoot him. I just come up with my gun that way (illustrating). I may have saved my young'n's life as well as my own. He was done raising that gun on me when I shot."
It does not appear from the evidence whether the gun, which the defendant contends in his statement the deceased was pointing at him at the time the defendant fired the fatal shot, had any shot indentures or shot in it. The shotgun with which the defendant admittedly killed the deceased was introduced in evidence. The record is silent as to whether there were any marks or shot signs on the gun. The solicitor in his argument stated: "An examination of the gun alleged to have been used by the deceased did not have any signs of bullet marks on it, and if the gun had been in *Page 678 
the position stated by the defendant at the time he, the defendant, fired the gun at the deceased, the gun alleged to have been held by the deceased would most certainly have been hit." This statement of the State's attorney is unchallenged by counsel for the defendant. Ground 2 of the general grounds is abandoned by counsel for the defendant.
Counsel for both the defendant and the State in their argument deal with the amended grounds in their order, then the general grounds. We will discuss them in such order.
1. Special ground 1 assigns error because the court failed to charge, without a written request to do so, Code, § 26-1013, which reads: "If after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another; but it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended, or might accrue to the person, property, or family of the person killing."
It is contended that it was especially erroneous and harmful to fail to charge this section, even in the absence of a written request, where the court did charge in its entirety Code, § 26-1011, which reads: "There being no rational distinction between excusable and justifiable homicide, it shall no longer exist. Justifiable homicide is the killing of a human being by commandment of the law in execution of public justice; by permission of the law in advancement of public justice; in self-defense, or in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either; or against any persons who manifestly intend and endeavor, in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein."
It is true that the homicide occurred on a public road in front of the defendant's house, but there is no evidence on behalf of the defendant or the State that the deceased was attempting to forcibly attack and invade the habitation of the defendant. The evidence *Page 679 
as to where the body of the deceased was lying in the road between the car from the house approximately 40 feet away from the house does not warrant the conclusion that at the time the defendant fired the fatal shot it was absolutely necessary to do so to prevent such an attack and invasion if such was the intent of the deceased. Indeed, the statement of the defendant, which we have set out above, does not warrant the conclusion that it was "absolutely" necessary for the defendant to kill the deceased to prevent an attack and invasion of his habitation. Further, the statement of the accused to Mr. Cliett does not indicate that the defendant fired the fatal shot to prevent a forcible attack and invasion of the home of the defendant by the deceased. Under this section, there must be a combination both of forcible attack and an invasion of the habitation of another to bring one within the realm of justification for taking the life of another. This court said in Gresham v. State, 70 Ga. App. 80, 83 (27 S.E.2d 463) : "Section 26-1013 of the Code, which refers to self-defense in instances of forcible attack and invasion of the property or habitation of another, requires both a forcible attack and aninvasion of the property or habitation of another. This section, as applied to the facts in the instant case, does not provide merely for the attack upon the person, or merely for the invasion of the habitation, but the forcible attack and invasion must both concur in order for the provisions of the section to apply. . . The evidence would seem to make a case of an attack upon the defendant's person rather than upon his habitation." (Italics ours.) See also Jackson v. State, 69 Ga. App. 707
(26 S.E.2d, 485); Love v. State, 14 Ga. App. 49 (3) (80 S.E. 209). The evidence in the instant case does not require a reversal because the court failed to charge Code, § 26-1011. The defendant in his statement contended that he was in his house when the deceased stopped the car in front of the house. The defendant came out of his house and onto the porch from where he shot the deceased, and remarked to the deceased to quit cursing his (the defendant's) wife. Not at any time did even the defendant say that he endeavored to persuade or remonstrate with the deceased not to enter his house. The Code section requires this before one can be entitled to invoke its provisions. We might state in this connection also that under the facts of this case it is not cause for reversal for the court to read in its entirety Code, § 26-1011. Floyd *Page 680 
v. State, 143 Ga. 286 (3) (84 S.E. 971). See also Freeney
v. State, 129 Ga. 759, 769 (59 S.E. 788); Pyle v. State,187 Ga. 156, 158 (200 S.E. 667). It thus seems clear to us that the cause for the killing was not because of any attempt by the deceased to forcibly attack and invade the home of the defendant. Counsel for the defendant cite in support of their contentions in this connection: Smith v. State, 106 Ga. 673
(32 S.E. 851, 71 Am. St. R. 286); Norris v. State, 184 Ga. 397
(4) (191 S.E. 375); Wittle v. State, 50 Ga. App. 170
(177 S.E. 356); Glaze v. State, 2 Ga. App. 704
(58 S.E. 1126); Thornton v. State, 18 Ga. App. 744 (90 S.E. 489);West v. State, 155 Ga. 482 (6) (117 S.E. 380); Hudgins
v. State, 2 Ga. 173 (4). We find nothing in the cases cited that would warrant a reversal of the case on this ground.
2. Special ground 2 assigns error because the court erred in charging the law of voluntary manslaughter under a heat of passion. The defendant in his statement admitted the killing and claimed justification on the ground of self-defense. If the jury had believed this, they would have acquitted him. They rejected it — that is the part which claimed justification. With this contention of the defendant eliminated, they were authorized to believe that the defendant killed the deceased under a heat of passion because of the previous difficulty between the defendant and the deceased several hours prior thereto. It is well established that if there is the slightest doubt, under the evidence, as to whether the offense is murder or voluntary manslaughter, the law of both of these offenses should be given in charge to the jury. Dickey v. State, 60 Ga. App. 199
(3 S.E.2d, 238); Tucker v. State, 61 Ga. App. 661
(7 S.E.2d, 193); Hamby v. State, 71 Ga. App. 817 (4) (32 S.E.2d 546). It is impossible for anyone to know just what happened just prior to and at the time the fatal shot was fired — except from the statement of the defendant. The circumstances surrounding the situation of the killing would have authorized a verdict for murder, should we eliminate the defendant's statement as to how it happened. This is true because when a killing is shown the law presumes that it was done with malice and is murder. While it is true that the deceased had made threats several hours prior to the homicide that he would kill the defendant, it is also true from the evidence that the defendant had made similar threats against the deceased. As to whether the deceased voluntarily *Page 681 
stopped in front of the defendant's house for the purpose of killing the defendant, or whether he took his gun, alighted from his car, and was advancing around his car with his gun and was pointing it at the defendant at the time the fatal shot was fired, are mere matters of conjecture once we eliminate the statement of the defendant. It is a matter of conjecture whether between the time the deceased was last seen and the time the fatal shot was fired he repented and stopped in front of the defendant's house to make peace or for some other purpose — we do not know. Also, whether or not he got out of the car without any gun and the gun which lay near his side loaded but unfired was placed there after the fatal shot was fired, is likewise a mere matter of conjecture. All of these were instances and circumstances which only one arm of the administrative forces of trial for homicide is authorized to determine, and that is the jury. It was the duty of the judge, under the facts of this case, to give in charge the law of voluntary manslaughter and then it was for the jury to say, under the law and facts, whether the offense was murder or manslaughter or justifiable homicide. This ground is without merit.
3. Special ground 3 assigns error because the court failed, without a written request, to charge Code, § 26-1014, which reads: "If a person shall kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing that, in order to save his own life, the killing of the other was absolutely necessary; and it must appear, also, that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given." This section is applicable only where the law of mutual combat is involved under the evidence. The court charged fully upon the law of murder, voluntary manslaughter under a heat of passion, and justifiable homicide in self-defense. The defendant claimed that he killed the deceased in self-defense. As already observed, other than what the defendant stated as to what happened at the time the fatal shot was fired, what actually happened was mere conjecture. In his statement he contended that he shot in self-defense. Counsel for the defendant contend that, since the evidence shows that the defendant had declined any further controversy with the deceased several hours prior to the homicide, this section is applicable and should have been charged without a written *Page 682 
request. We do not think that this reasoning is sound. Other than from the statement of the defendant, we do not know that the deceased intended to engage in mutual combat. In Williams v.State, 57 Ga. App. 176, 179 (194 S.E. 822), this court said: "It has been held many times that where the judge fully charges the jury on the law of justifiable homicide, it is not error, in the absence of a timely written request, to fail to give in charge § 26-1014." See also Copeland v. State, 23 Ga. App. 667
(2) (99 S.E. 136); Jones v. State, 172 Ga. 500
(158 S.E. 44); Benton v. State, 185 Ga. 254, 256 (194 S.E. 166);Bivins v. State, 200 Ga. 729 (38 S.E.2d 273). It will thus be seen, even if it may be conceded that the deceased and the defendant were engaged in mutual combat, it is not reversible error for the court to fail to charge the provisions of the Code, § 26-1014, without a written request.
4. Special ground 4 is but an elaboration of special ground 1 and is dealt with in the first division of this opinion.
5. If what we have said above is correct, the assignments of error on the general grounds are without merit. The evidence sustains the verdict. The court did not err in overruling the motion for a new trial for any of the reasons assigned.
Judgment affirmed. Broyles, C. J., and MacIntyre, J.,concur.