24588.   PARK v. THE STATE.

ARGUED MAY 13, 1968—DECIDED JULY 2, 1968—
REHEARING DENIED JULY 16, 1968.

*Wesley R. Asinof,* for appellant.

*G. Wesley Channell,* Solicitor General, *Luther Hames, Jr., Arthur K. Bolton,* Attorney General, *Marion O. Gordon, Mathew Robins,* Assistant Attorneys General, for appellee.

GRICE, Justice.   This appeal is from a verdict of guilty of murder without a recommendation of mercy and a sentence of death by electrocution.   The appellant A. C. (Cliff) Park was indicted jointly with George Douglas Pinion, John Hyman Blackwell, Lloyd George Seay and George Iras Worley by the grand jury of Jackson County for the murder of Floyd G. Hoard by the use of dynamite and other explosive substances on August 7, 1967.

Between 7 and 7:30 a.m. on that date, Hoard, then the Solicitor General of the Piedmont Judicial Circuit which includes Jackson County, got into his automobile which was parked at

his home, and when he attempted to start the ignition the car exploded as the result of dynamite that had been wired to the ignition system. His death was almost immediate.

Park entered a plea of not guilty and was tried separately. Objections to the admissibility of certain evidence and also motions to exclude specified admitted evidence were overruled. Because of the State's contention that he had introduced evidence, he was not permitted to make the opening and concluding argument to the jury. Upon the conclusion of the State's evidence and his unsworn statement denying any connection with the homicide, the defendant Park moved for a directed verdict of not guilty, which was overruled. The foregoing rulings are the subject matter of his enumerations of error.

From the 20 enumerations of error the following four broad issues emerge: (1) Were certain items of testimony admissible? (2) Was the evidence sufficient to submit to the jury the question of whether the defendant was a participant in a conspiracy to murder Hoard? (3) Did the evidence sufficiently corroborate the testimony of an accomplice to the murder? and (4) Was the defendant entitled to the opening and concluding argument to the jury?

The evidence as to events leading up to the homicide, insofar as essential here, is that which follows.

About the latter part of March, 1967, Solicitor General Hoard was concerned about the illegal sale of alcoholic beverages being made from a garage at the residence of the defendant Park and also from a building owned by him and known as "the yellow house," both located in Jackson County, where the sale of alcoholic beverages was not legal. There was evidence that since 1965 Park and the co-indictee Pinion had worked together in such sales. In late March Hoard began an investigation of these sales. This investigation was begun without telling local sheriff Perry, but later Hoard apparently informed him.

Hoard obtained the assistance of an agent of the Georgia Bureau of Investigation, and in turn other law enforcement personnel were brought in. Several of these men made purchases at the above named places in order to obtain evidence for a contemplated padlock proceeding. One testified that "this was

an open operation and there—nothing hidden about the thing. You just walked in there and asked him for some liquor and he sold it to you and it was more or less generally known it was carried on that way."

A raid was scheduled for Saturday afternoon, May 6, 1967. However, on Friday evening it was discovered that Park was attempting to move large quantities of alcohol from these two places. Thereupon, the scheduled raid was immediately made and $21,700 of contraband, consisting of 31 cases of whiskey and 2,254 cases of beer, was taken. Park and Albert Funderburk, who had been employed at "the yellow house" by Park for almost two years, were arrested. Criminal cases were made against the two men by Hoard.

On May 23, 1967, upon Hoard's petition, an order was issued directing that the two places be padlocked.

On July 11, 1967, Park, Funderburk and another employee of Park entered pleas of guilty for such illegal alcohol operations, and their fines, totaling $6,300, were paid by Park. Also, on this date, an appeal from the padlock order was dismissed. About this time Funderburk made plans to move back into the yellow house in August.

Neither this padlock order nor the confiscation order on the alcohol seized was carried out until after the death of Hoard. There is no evidence as to why these orders were not executed.

An Atlanta police officer testified that on the morning of August 7, 1967, he was en route to the courthouse of Jackson County to go before the grand jury with reference to auto larceny there.

Next, we recite the salient testimony of events immediately surrounding the murder.

This testimony was given by the co-indictee Blackwell, to whom the State had offered to recommend a life sentence provided he would testify fully, fairly and completely, and also by the co-indictee Seay. No mention of any such offer to Seay appears.

Blackwell's testimony, insofar as material on these issues, was that which follows.

Prior to Solicitor General Hoard's death Seay asked Blackwell

if he had the nerve to kill anybody and two weeks later inquired of him if he would "blow that man up," without identifying anyone. No affirmative answer appears to have been given.

On Thursday before Hoard's death on Monday, August 7, 1967, Seay, Blackwell, and another co-indictee, Worley, met by pre-arrangement at a named highway restaurant in another county and drove to Anderson, South Carolina, where Blackwell, with money provided by the others of that group, purchased sticks of dynamite and caps. On Saturday Seay showed Blackwell how to connect these to the coil of an automobile.

On Sunday evening Blackwell, Seay and Worley met. Seay offered Blackwell $1,500 if he would go with them and watch while Seay or Worley put the dynamite on the car. One of them, Seay he thought, told Blackwell "the man wanted it done that night before he went to court on Monday." Worley pointed out Hoard's house, and Seay made a short trip to verify it and the car parked there as Hoard's. During this time Blackwell and Worley went to a nearby place, wired several sticks of dynamite together, and returned to a point near Hoard's residence.

Then Blackwell went to Hoard's yard where his car was parked, placed the dynamite and one cap to the coil of the car, and rejoined Seay and Worley. The three drove away, and at a bridge the shoes and gloves Blackwell had worn were thrown out.

Later on the same night Blackwell went to Wrightsville, Georgia, and during the morning heard over the radio of Hoard's death.

On the following Wednesday, Seay gave Blackwell $700 in cash and an automobile valued at $800.

Blackwell identified certain photographs, including places and objects associated with the murder.

The testimony of the co-indictee Seay, insofar as material here, was that which follows.

He had known Blackwell about eight months, Worley four or five years, and Pinion some six to eight years. He was 23 years of age and had known Park since childhood.

He had not had any direct dealings with Park.

In June, about two months before Hoard's death, Pinion asked

Seay if he wanted to make some "easy money," and later told him that "he wanted a man done away with," saying it was Hoard. He did not say who wanted it done, but mentioned to him "the old man" several times.

Pinion had told Seay on a number of occasions that he was working with Park, and Seay once talked with both of them about their buying liquor from him. They talked about payment and arrangements in connection with this, and one of them told him that whenever he needed money he could come to Park's place and pick it up, but Seay did not recall ever doing so.

This dealing with Park and Pinion began three or four years previously and continued until Hoard was killed. Pinion was the only person he dealt with on behalf of Park. When he had the conversation with Pinion about doing away with Hoard, he knew that Pinion was acting on behalf of Park, and in their conversations Pinion and he always referred to Park as "the old man."

Pinion did not tell Seay that "the old man" wanted Hoard done away with, but that "a man wanted somebody done away with." Also, he did not say why he wanted Hoard killed. He mentioned to Seay the liquor raid made by Hoard, but Seay did not recall whether this was at the same time he discussed killing Hoard.

Pinion first offered Seay $5,000, and said it would be best to kill Hoard on the road with a shotgun as he was returning home.

Seay told Pinion that he was not interested but would try to find someone. Seay mentioned it to Worley, who wanted $7,500. Worley did not know whom Seay had in mind to be killed. Pinion said that Hoard had to be killed before he went to court that Monday morning, and Seay so told Worley. Seay then reported to Pinion that he had someone to do it if he would pay more money. Pinion replied "Well, that is all the man will pay," and "I don't think the man will pay any more. I will go see. I will check." Pinion left and in about 45 minutes he returned and told Seay, "the old man won't go up any more. I will put $500 on it. Make it $5,500." Worley did not wish to do it but decided to go ahead.

On either Thursday or Friday, Seay, Blackwell, and Worley

arranged their meeting at a highway restaurant, made the trip to South Carolina, purchased the explosives, returned to Jackson County, and Blackwell experimented with wiring the caps to a 1964 Ford automobile.

Seay told Worley that he did not want to be involved, but Worley replied that if he didn't, "the old man" would get someone else and intimated that "the old man" would harm him or his family. Seay knew whom Worley was referring to, and stated that "we always referred to 'the old man' as Mr. Park."

Seay then testified essentially the same as Blackwell with reference to what transpired later, including the meeting on Sunday night of him, Blackwell and Worley, their proceeding to and locating Hoard's residence and car, tying the explosives, Blackwell's rigging them to the automobile, disposing of the shoes and gloves, going to Wrightsville, learning of Hoard's death, and returning to Pickens County. Seay also identified the same photographs that Blackwell had verified.

Five or six days after Hoard's death Pinion brought $5,500 in cash to Seay, and Seay gave the money to Worley who divided it $2,000 to Seay, $2,000 to Worley and $1,500 to Blackwell. Pinion told Seay that "the old man" was worried and had asked who did it, and that he had told him others did it.

There was testimony by other witnesses for the State, which verified some of the foregoing, particularly the physical facts, but it is not necessary to recite it here.

In his unsworn statement Park disavowed any participation whatever in the murder of Hoard.

Motions were made to exclude many items of testimony, but they were denied.

The defendant moved for a directed verdict of not guilty. This motion urged that the evidence failed to show that the defendant Park was a party to a conspiracy to murder Hoard and also that the testimony of Seay, an alleged accomplice, was not corroborated. This motion was denied.

Pursuant to a ruling by the court, the State was permitted to make the opening and concluding argument to the jury.

■ We first consider the rulings as to the admission of certain evidence.

■ Six of the enumerations complain of separate conversations between agents of the Georgia Bureau of Investigation and Hoard, another agent, the sheriff and a state trooper. The seventh relates to a conversation between the sheriff and another person. These were claimed to be inadmissible because they were hearsay. From the study we have made of such enumerations we conclude that these conversations were properly admitted in evidence to explain the conduct and ascertain the motives of parties on the major issue of conspiracy. *Code* § 38-302; *Bryant v. State*, 191 Ga. 686 (14) (13 SE2d 820); *Jones v. State*, 224 Ga. 283, 285 (161 SE2d 302).

■ Another enumeration relates to testimony that when a named person sold the witness liquor several times it was really on behalf of Park. It is contended that this was a conclusion, without probative value. This contention is not meritorious. This statement was based on facts already in evidence.

■ One enumeration urges that it was erroneous to permit the witness Seay to testify that he knew whom Worley meant when he referred to "the old man." This was not a mere conclusion, as contended, because Seay also testified that he and Worley always referred to Park as "the old man."

■ The final enumeration in this category argues that the trial court erred in permitting Seay to testify to a conversation when both Pinion and Park were present, without requiring proof as to whether it was Pinion or Park who made such statements. This is not valid. The witness testified that he could not remember which one said it, thus leaving the matter for the jury's determination.

■ ■ Since this defendant did not commit the act itself and was not actually present at the scene when others committed it, in order for him to be convicted the evidence must connect him with the crime upon the theory of conspiracy, which is "a corrupt agreement between two or more persons to do an unlawful act." *Fincher v. State*, 211 Ga. 89 (4) (84 SE2d 76).

Proof of conspiracy is required for the admission of the testimony of Seay as to declarations allegedly made to him by Pinion and as to statements allegedly made to him by Worley.

Our *Code*, § 38-306, provides that "After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." This court, in applying this section, has held that the conspiracy itself must be proved by evidence aliunde such declarations, and that the declarations are not admissible unless the conspiracy is prima facie shown by such aliunde evidence. *Lanier v. State*, 187 Ga. 534 (4), 542-543 (1 SE2d 405), and citations.

The existence of a conspiracy "may be established by direct proof, or by inference, as a deduction from acts and conduct, which discloses a common design on their part to act together for the accomplishment of the unlawful purpose. In other words, the existence of the common design or purpose between two or more persons to commit an unlawful act may be shown by either direct or circumstantial evidence." *Chappell v. State*, 209 Ga. 701, 702 (75 SE2d 417).

Under the evidence here there was admittedly and unquestionably a conspiracy among several persons to violate the laws of this State with reference to the sale of alcoholic beverages. It is equally certain that the defendant Park and Pinion were members of that conspiracy, and it is probable that others, including Seay, belonged to it.

The State contends that Hoard's death was pursuant to or in furtherance of that conspiracy. It relies upon the rule that "It is not necessary that the crime of murder should be a part of the original design; but it is enough if it be one of the incidental probable consequences of the execution of their design . . ." (*Gore v. State*, 162 Ga. 267 (1a) (134 SE 36)), or if it is "naturally or necessarily done pursuant to or in furtherance of the conspiracy." *Handley v. State*, 115 Ga. 584 (41 SE 992) (one Justice absent).

The State urges that the evidence as a whole, and with all inferences and deductions therefrom, leads to the conclusion that the death of Hoard was deemed necessary to protect Park's illegal liquor operations and was in furtherance of the conspiracy to violate the liquor laws. It argues that Hoard's death was considered necessary because he planned to present

to the grand jury on the day of his death facts as to Park's activities.

For support of this contention the State relies upon much of the foregoing evidence, including the following: that Hoard had instituted the padlock proceedings against Park; that he had caused the confiscation of Park's contraband alcohol; that he had filed criminal accusations against Park and others; that they had plead guilty and their fines totaling $6,300 had been paid by Park; that Park's liquor locations had not been in fact padlocked; that the contraband had not been destroyed; and that Funderburk intended to move back in "the yellow house" in August.

As we view the record, a conspiracy involving the defendant in the murder of Hoard was prima facie shown by such aliunde evidence, and the inferences and deductions therefrom.

■ In view of such evidence as to conspiracy it follows that it was not error to permit Seay to testify as to the declarations made to him by Pinion that "the old man won't go up any more" and that "the old man was worried"; or as to Worley's statement to him that "the old man" would harm him or his family if he did not participate.

Accordingly, it was not error for Seay to testify that Pinion told him that he was working with Park in the liquor business. Nor was it error for him to testify that he knew when he was dealing with Pinion in June that he was dealing with him as agent of Park, since the basis for that statement was what Pinion had told him about Park's involvement in the conspiracy to kill Hoard.

Also, it was not error to permit a law enforcement officer to testify as to what Pinion told him during the interval between the commission of the crime and its solution as to his whereabouts the night that Hoard was killed.

Therefore, none of the items of testimony referred to above were hearsay, as contended. Nor were they mere conclusions.

■ ■ Since there was evidence of Park's participation in a conspiracy to murder Hoard, the grounds of Park's motion for directed verdict which urged that there was no such evidence were not meritorious.

■ Nor was there merit in the ground of that motion which asserted that he was entitled to a directed verdict of not guilty because the testimony of Seay, an alleged accomplice, was not corroborated by other evidence connecting the appellant with the murder.

Our *Code*, § 38-121, requires that in a felony case the testimony of an accomplice must be corroborated.

As to this requirement, this court in *Lanier v. State*, 187 Ga. 534, 539, supra, stated: "This court has construed that portion of this Code section relating to the necessity of connecting an accomplice in felony cases many times, and no doubt can now be fairly entertained as to its meaning as construed. In every case the corroborating circumstances must connect the defendant with the crime independently of the testimony of the accomplice, and this requirement is not met by merely corroborating the accomplice as to time, place, and circumstances of the transaction, if there be nothing to connect the defendant therewith." See also, *Childers v. State*, 52 Ga. 106; *Myers v. State*, 151 Ga. 826 (108 SE 369); *Price v. State*, 208 Ga. 695 (3a) (69 SE2d 253).

However, "It is not required that this corroboration shall of itself be sufficient to warrant a verdict, or that the testimony of the accomplice be corroborated in every material particular. [Citations.] Slight evidence from an extraneous source identifying the accused as a participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict. [Citations.] The sufficiency of the corroboration of the testimony of the accomplice to produce conviction of the defendant's guilt is peculiarly a matter for the jury to determine. If the verdict is founded on slight evidence of corroboration connecting the defendant with the crime, it cannot be said, as a matter of law, that the verdict is contrary to the evidence." *Hargrove v. State*, 125 Ga. 270, 274-275 (54 SE 164).

Ordinarily testimony of one accomplice if satisfactory to the jury is sufficient corroboration of another accomplice in a felony case. *Pope v. State*, 171 Ga. 655 (156 SE 599) (one Justice absent); *McCormick v. State*, 176 Ga. 21 (4) (166 SE 762); 7 West's Ga. Dig. 472, Criminal Law, § 511 (10).

However, even if the testimony of Seay, an accomplice, is deemed to be corroborated by Blackwell only insofar as to "time, place, and circumstances," without showing any criminal connection with the defendant Park (*Myers v. State,* 151 Ga. 826, supra), ample evidence exists of corroboration connecting Park with the crime by reason of his conduct, as detailed in Division 2 (a). *Williams v. State,* 222 Ga. 208, 220 (149 SE2d 449) (one Justice dissenting). See also, *Thornton v. State,* 119 Ga. 437, 439 (46 SE 640).

The evidence relied upon by the State as corroborating the testimony of the accomplice Seay tended to connect Park with the murder and was sufficient to support his conviction.

For the foregoing reasons, the motion for directed verdict of not guilty was properly overruled.

■ The last enumeration of error complains of the trial court's ruling denying the defendant Park the right to the opening and concluding argument to the jury. This ruling was based on the fact that the defendant, while making his unsworn statement, referred to and displayed certain documents.

The record is not clear as to exactly what occurred in this regard. The defendant's statement shows only the following: "I gave Mr. Hoard the power of attorney in 1957. And this here is just a copy of some insurance to show that I lent Mr. Hoard the money [previously referred to in the statement]. It's got Mr. and Mrs. Floyd Hoard on it. Lad and Lassie Shop, $1,000." No objection by the State is shown. The State's motion for the opening and concluding argument stated: "Park exhibited to the jury a power of attorney . . . He showed it and displayed it to the jury. The second thing is that he showed an insurance policy in support of his contention that he had loaned Fuzzy Hoard money . . ."

We find this enumeration meritorious.

Our *Code,* § 27-2201, provides: "After the testimony shall have been closed on both sides, the State's counsel shall open and conclude the argument to the jury, except that, *if the defendant shall introduce no testimony,* his counsel shall open and conclude after the testimony on the part of the State is closed." (Emphasis supplied.) The word "testimony" includes

documentary evidence. *Hargrove v. State,* 117 Ga. 706, 708 (45 SE 58).

So far as we are able to ascertain, this court has never passed upon the precise question now presented, i.e., whether the defendant loses the right to the opening and concluding argument by exhibiting documentary evidence, although not formally introducing such into evidence.

However, in *Freeney v. State,* 129 Ga. 759, 765 (59 SE 788), where the defendant had been denied the opening and concluding argument, this court stated that the exact question before it was whether some rent receipts "were simply read or spoken of in the defendant's statement, or were introduced in evidence," thus recognizing a distinction between the effect of a defendant's exhibiting a document and of his introducing it in evidence.

In the *Freeney* case the defendant in making his statement had referred to rent receipts and exhibited them to the jury by handing them to the jury and letting them examine them and hand them back. The solicitor general then requested the stenographer to mark them for identification which was done; later, execution of a receipt was proved by a State's witness on cross examination; and then defendant's counsel said "We offer that with the others; they are already in evidence," to which the solicitor general replied "All right." The court found that the receipts were introduced in evidence and therefore that the denial of the opening and concluding argument to the defendant was correct. Justice Lumpkin, writing the opinion for the court, stated "If it were clear that the rent receipts which formed the subject of the ruling in regard to the opening and conclusion of the argument were merely read by the defendant as a part of her statement, without objection from counsel or ruling thereon by the court, and were not introduced in evidence, the writer would be strongly of the opinion that this would not have affected the right of her counsel to open and conclude the argument." P. 764.

Later, the identical question now before this court was ruled upon by the Court of Appeals. *Hart v. State,* 88 Ga. App. 334 (76 SE2d 561). It expressly adopted Justice Lumpkin's view

above quoted, and reversed the denial to the defendants of the opening and concluding argument where they "had introduced no evidence but had merely made their statements during the making of which one of the defendants exhibited to the jury certain clothing, but this was never introduced in evidence." The court pointed out that " . . . it has been held that it is not error to refuse to allow the defendant to read to the jury from papers and documents not introduced in evidence . . ; yet it has never been held in this State . . . that, where a defendant in making his statement reads inadmissible documents or exhibits inadmissible objects to the jury, this action in and of itself constitutes the documents or objects to be evidence even though they are never introduced." It held: "While the trial court in the present case would not have erred under the authorities referred to above, in refusing the defendant the right to use the clothing to illustrate that the deceased was attacking the defendant with a screw driver, having failed to do so at the request of the solicitor general, we think that the court could not cure that error by depriving the defendants of their right to the opening and concluding argument where they introduced no evidence, and the case must be remanded for a new trial."

Subsequently, the Court of Appeals dealt with this same subject, but with different facts, in *Carter v. State*, 107 Ga. App. 571 (3) (130 SE2d 806). There, the defendant was charged with giving a worthless check. While making his unsworn statement he wrote his name on a paper and showed it to the jury for the purpose of comparing it with the signature on the check. The record of the case recites that this paper was "shown to jury and accepted," and that immediately thereafter the solicitor said, "Your Honor, have him print it, this signature is printed." The record does not indicate whether this was done.

The *Carter* case opinion quoted from *Hall v. State*, 104 Ga. App. 10, 11 (120 SE2d 925), the rule that the statement "must generally be restricted to a narrative account of the matter under investigation, and if the defendant desires to corroborate the statement by documentary or real evidence, said evidence must be introduced in the usual and regular way." The *Carter* opinion then stated: "Under the record here it is manifestly clear

that the court considered the sheet of paper that the defendant wrote his name on as being evidence," citing *Savannah Electric Co. v. Lowe*, 27 Ga. App. 350 (5a) (108 SE 313). In the latter case it held that where municipal ordinances were "not formally tendered in evidence," but were pleaded and read to the court in the presence of the jury without objection, such treatment of them will be taken "as equivalent to a formal tender." After citing the *Savannah Electric Co.* case, the *Carter* opinion stated: "Applying the facts in the case to the law enunciated in the case just cited, the trial court's ruling denying defendant's counsel the opening and concluding argument was not error." Therefore, this was a holding that the defendant introduced evidence, and for that reason lost his right to the opening and concluding argument in view of *Code* § 27-2201.

Here, the record contains no indication whatsoever that the documents mentioned by the defendant in his statement were introduced in evidence. The State does not even contend any more than that these papers were *exhibited* to the jury. So far as is shown they never left the defendant's hands.

Having introduced no evidence, the defendant was entitled to the opening and concluding argument.

The conclusion which we have reached accords with that set forth in 23 CJS 982, Criminal Law, § 983: "In some jurisdictions counsel for accused may open and close the argument, in cases where accused introduces no evidence. Where an accused is permitted to make a statement not under oath which is not, in a technical sense, evidence, as shown infra § 1026, the making of such statement does not deprive him of the right to open and close if he introduces no evidence; and it is not proper for the court to deprive him of the right even though he is permitted, in making the statement, to exhibit to the jury objects which are inadmissible or to read to the jury from inadmissible documents." Cited are *Freeney v. State*, 129 Ga. 759, supra, and *Hart v. State*, 88 Ga. App. 334, supra.

This right to open and conclude when the defendant introduces no evidence has been the law of this State since January 22, 1852 (Ga. L. 1851-52, p. 242; *Code* § 27-2201). It is a sub-

stantial procedural right and has many advantages. It is available to all.

This defendant was entitled to a trial in accordance with law, which included the exercise of this right.

Speculation as to whether its denial was prejudicial to him has no place here. In this instance the death penalty was imposed. It cannot be said that the error was harmless.

For the reasons set forth in Division 4 of this opinion the judgment is reversed with direction that the defendant be granted a new trial.

*Judgment reversed with direction. All the Justices concur, except Duckworth, C. J., Nichols and Undercofler, JJ., who dissent.*

NICHOLS, Justice, dissenting. I dissent from the holding in Division 4 of the majority opinion as well as from the judgment of reversal.

While the majority opinion cites cases which correctly hold that upon objection by the solicitor general the defendant may be precluded from exhibiting physical evidence to the jury in corroboration of his unsworn statement, yet the law does not place the burden upon the solicitor general to warn, by objection, the defendant that he is in danger of losing, by such conduct, the right of having the opening and concluding argument where he has not introduced any other evidence during the trial of the case.

The transcript of the evidence in the present case discloses that the defendant used the language "this here" in his unsworn statement to the jury which shows without dispute that he was exhibiting documents to the jury to corroborate his unsworn statement. Such conduct was tantamount to introducing such documents into evidence and accordingly the trial court did not err in so holding and in giving to the State the right to open and conclude the argument to the jury.

I am authorized to state that Chief Justice Duckworth and Justice Undercofler concur in this dissent.