**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**James WILLIAMSON,**
and
**Jack Williamson, Defendants-Appellants.**

**No. 71-1176**

**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

Oct. 19, 1971.

Rehearing Denied Nov. 23, 1971.

---

* [1] Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

David E. Crawley, Jr., Kosciusko, Miss., M. A. Marsal, Mobile, Ala., for defendants-appellants.

H. M. Ray, U. S. Atty., Oxford, Miss., William M. Dye, Jr., Alfred E. Moreton, III, Asst. U. S. Attys., Oxford, Miss., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Appellants James Williamson and Jack Williamson were convicted on multiple counts of an indictment alleging various substantive violations of the Federal revenue laws governing distilled spirits and conspiracy to violate those laws.[1] Each was sentenced to concurrent four year prison terms. Finding no prejudicial error, we affirm.

The appellants urge two grounds for reversal. First, they claim that the out-of-court statements of a special Government undercover agent (Adams) introduced through the testimony of an investigator (Petre) to whom the statements had been made as part of the prosecution's attempt to establish the existence of a conspiracy, were erroneously admitted under the so-called "co-conspirator" exception to the hearsay rule. Broken down into its component parts, this argument amounts to the contentions that (i) an undercover agent, feigning participation in a criminal conspiracy at the explicit direction of the United States, is not a co-conspirator as a matter of law, (ii) out-of-court reports or statements of such an agent are therefore not admissible under the "co-conspirator" exception and (iii) the admission of the hearsay testimony prejudiced the defendants because it permitted the jury to find them guilty of a conspiracy proved in substantial measure by statements made out of their presence and without their knowledge.[2] Appellants' second argument is that the Trial Court incorrectly charged the jury that they might consider the acts and declarations of the undercover agent as being the acts and declarations of a co-conspirator.

---

1. In addition to the conspiracy count (18 U.S.C.A. § 371), both defendants were charged with carrying on the business of a distiller without having given bond (26 U.S.C.A. § 5601(a) (4) and 18 U.S. C.A. § 2), unlawful possession of a still (26 U.S.C.A. § 5601(a) (1) and 18 U.S. C.A. § 2) and possession of tax-unpaid whiskey (26 U.S.C.A. § 5604(a) (1)). The indictment alleged 60 overt acts in furtherance of the conspiracy and, among others, named as co-conspirators but not as defendants Sam Dryden, Ray Hutcheson, Charles McCracken and Joe Adams (a "special employee" of the United States.)

2. Although the point is somewhat unclear, we assume that appellants are also contending that the allegedly erroneous admission of the testimony on the conspiracy count prejudiced their defense on the remaining substantive counts. Otherwise a finding for them on the conspiracy issue alone would still leave standing the other convictions. United States v. Boatwright, 5 Cir., 1971, 446 F.2d 913 [August 11, 1971]; Juarez-Flores v. United States, 5 Cir., 1968, 394 F.2d 161, 163, cert. denied, 393 U.S. 942, 89 S.Ct. 311, 21 L.Ed.2d 278.

*Petre's Testimony: Stage I*

The prosecution's case on the conspiracy count rested for the most part upon the testimony of two witnesses: John Petre, a retired Treasury agent formerly stationed at Newman, Georgia, and Joe Allen Adams, hired by Petre to work undercover in the investigation of the case. Petre initially testified that after discovering Adams' involvement with Hutcheson and Dryden, two of the alleged conspirators, he talked to Adams "to see if he would testify for the government instead of being a defendant in the case" (App. 27). Over the defense's continuing objection that the testimony was hearsay, Petre was permitted to recount the substance of several conversations with Adams that took place between December 1967 and April 1968, including the one in which Adams agreed to assist in the investigation in return for Petre's intercession in his behalf in connection with a Federal criminal prosecution that was then pending against Adams in Mobile, Alabama.

*Petre's Testimony: Stage II*

The remainder of Petre's testimony, also subjected to defense objections that it was inadmissible hearsay, concerned conversations with Adams that took place after Adams went to work for Hutcheson. On May 1 Adams telephoned Petre to report that he and Hutcheson had taken a truck to Atlanta for the purpose of having a "trap" or hidden compartment built into the back of it. He was advised to continue his reports on the truck and its activities. In his next call on May 13 Adams reported that Hutcheson had invited him to become a partner in the liquor business and was told that he was to continue to work only as an employee.

On May 29 Petre and two other agents went to Adams' residence in Cedartown, Georgia, where Adams told them that Hutcheson and Dryden had discussed the possibility of setting up a distillery in Polk County and had also talked about the alterations on the truck. On June 10 Adams reported that Hutcheson was sending him to a motel in Meridian, Mississippi to pick up a load of whiskey, calling a few days later from the motel to report that Hutcheson had not arrived. Later Adams and Hutcheson picked up the truck, and on June 16 Adams told Petre that Hutcheson had given him $2400 to pay for a load of liquor to be picked up at the Pure Oil truckstop in Meridian. Adams subsequently informed Petre that the pick-up had not been made because the contact man had been too drunk to consummate the deal.

On June 18 Petre met Adams on a country road where he photographed and inspected the truck. At that time Adams stated that he, Hutcheson and Dryden had agreed upon the price to be paid to Adams in return for hauling the whiskey. Shortly after this meeting Petre went on vacation, suffered a disabling injury that forced his retirement, and ceased his participation in the case. In his testimony concerning the events up to this point Petre had not mentioned either of the defendants.

*Adams' Testimony*

The rest of the story was supplied by Adams himself, who was called as the prosecution's next witness. After confirming the facts brought out in Petre's testimony, Adams stated that on June 27 Hutcheson called and requested his company on a trip to pick up a load of liquor in Mississippi. Hutcheson drove his own car, while Adams followed in the truck. They met at the home of Charlie McCracken, who placed a telephone call to an unidentified person.[3] Hutcheson then spoke to the other person and, after negotiating a reduction in the price, proceeded with the other men to a highway intersection several miles from Kosciusko, Mississippi, where they met appellant James Williamson. Williamson left in the trap truck and returned a few hours later with a full load of liquor. Adams then drove the loaded truck to

---

3. The call was placed to a telephone listed in the name of James Williamson.

Irondale, Alabama, where he contacted a Federal agent who photographed and inspected the truck.

Adams also testified to several subsequent transactions involving Hutcheson, Dryden and James Williamson in which Adams gave money to Williamson, who then drove off in the truck and returned with a load of liquor. During one of these meetings, on July 2, James Williamson drove Adams to a motel in Kosciusko, returning early the next morning to report that the truck was loaded and to receive a cash payment of $2172. The men drove together down Highway 19, at which time Jack Williamson pulled up behind them in the trap truck and turned it over to Adams. Following another meeting on July 7, Adams followed James Williamson to a barn near Meridian, where they met Jack Williamson and several other individuals. Jack counted the jugs while James and Adams loaded them into the truck, after which Adams paid them $2100 and left. Two more meetings with James Williamson followed on July 15 and July 17. Thereafter Adams terminated his association with Hutcheson and had no further dealings with either of the appellants.

Federal agents continued to keep the barn under surveillance and by following its occupants managed to locate a distillery set up in the woods about 12 miles from McAdams, Mississippi. Having observed several loading operations at the barn, they obtained a search warrant and conducted a raid on the night of July 30, catching James Williamson in the act of loading whiskey into the trunk of a car, the keys in his pocket. Analysis of the liquor revealed that it came from the still discovered earlier.

*Was It Hearsay?*

■ Our discussion of appellants' first argument that Petre's testimony constituted prejudicial hearsay is considerably simplified if we begin with a clear conception of what that term means. Simply stated, "hearsay" is any out-of-court statement introduced in evidence for the purpose of proving the truth of the matter contained in the statement.[4] Most if not all of the mystery and fog enshrouding this traditionally enigmatic rule of evidence evaporate if that textbook definition, well entrenched in our case law, is kept in mind. Most significantly, as applied to the facts of this case, it demolishes the fairly wide-spread misconception that somehow *words alone*, if they are not the words of the person testifying, must automatically be excluded. Words are not hearsay unless they constitute statements, and out-of-court statements are themselves not hearsay unless they are introduced for the purpose of proving facts contained in, or asserted by, those statements. With these thoughts in mind, we consider the two more or less distinct stages of Petre's testimony.

■ In its first stage Petre's testimony concerned the preliminary meetings and conversations leading up to the employment of Adams as an undercover agent. Clearly evidence of these conversations was introduced, not for the purpose of proving the truth of what either man said at the time,[5] but for the purpose of proving that when he went to work for Hutcheson Adams was in fact a Government investigator rather than a co-conspirator. Whatever problem of admissibility such testimony may entail,[6]

4. McCormick, Evidence (3d Ed.) § 228; 5 Wigmore, Evidence (3d Ed.) § 1361.

5. The transcript reveals relatively few instances in which Petre quoted or paraphrased either his own or Adams' words, and in none of those instances was there even the suggestion of an attempt to introduce into evidence a fact established by the out-of-court conversations. Indeed, there are few, if any, extra-judicial

assertions of fact revealed in this part of the testimony.

6. The major difficulty with Petre's Stage I testimony is not its hearsay character but its questionable materiality. Assuming that the jury was entitled to know of the events leading up to Adams' participation in the investigation, many of these matters perhaps could have been more properly brought out in the testi-

the hearsay rule presents no obstacle, and in any event appellants in their brief confine their attack to what followed.

■ Significantly, the second stage in Petre's testimony represents a radical departure from the first. Here he repeated statements in Adams' reports that contained assertions of fact regarding the activities of Hutcheson and Dryden, including several that had been alleged in the indictment as overt acts in furtherance of the conspiracy.[7] Despite the Government's strenuous contention that testimony regarding these statements was introduced merely to demonstrate that the statements had been made, rather than to establish the truth of the matters contained in them, the inescapable conclusion must be that they were hearsay.

In the first place, the mere fact that the statements were contained in Adams' reports to Petre was not materially related to any other issue in the case.[8] Secondly, even if some tenuous materiality could somehow be suggested, the obviously hearsay character of the testimony relating to Adams' statements, themselves assertions of fact going to the very core of the conspiracy issue, would prevail over the Government's self-serving contentions that it did not intend to introduce the testimony for a proscribed purpose. Since Petre in his testimony related Adams' extra-judicial statements of fact, and since those statements—if believed—tended strongly to establish the existence of a conspiracy, Petre's testimony in these respects was hearsay.

### Was It Admissible?

Given the fact of hearsay, the question now becomes whether Petre's Stage II testimony was nevertheless admissible under any of the established exceptions to the hearsay rule, including the so-called "co-conspirator" exception. We agree with the appellants' contention that it was not.

■ The most obvious reason why Adams' statements were not admissible as the declarations of a co-conspirator is that Adams clearly was not one. Lacking the specific intent to commit the offense,[9] he was at most a pseudo-criminal and at least a policeman disguised as a moonshiner. Since all of his activities were performed at the explicit direction of the United States, his statements to Petre were not those of a conspirator but of an undercover agent.

■ Moreover, even if we could somehow stretch the already well-elasticized definition of the term "conspirator" to include an individual who merely acts like one on appropriate occasions, the "co-

---

mony of Adams himself, thereby avoiding any suggestion that the prosecution was attempting to bolster the credibility of its own many-times-convicted witness.

7. For example, Petre testified that Adams told him on May 1 that "Ray and him took a truck, Ford truck, to Atlanta, Georgia, to have a trap built on it and to have it painted" (App. 49). The indictment alleged this as the fourth overt act in furtherance of the conspiracy. Petre also testified that Adams stated that "he had met Mr. Hutcheson and Mr. Dryden at Muscadine, Alabama, at Mr. Hutcheson's store, and they had agreed on a price would be paid to him for hauling the whiskey" (App. 74). The indictment alleged this as the eighth overt act.

8. Obviously there are any number of circumstances under which the very fact that the statements were made would permit testimony regarding them. Thus, if Adams had actually been a conspirator, statements made by him in furtherance of the conspiracy would have been admissible as "operative facts" inasmuch as they would have constituted elements of the offense charged. Huff v. United States, 5 Cir., 1962, 301 F.2d 760, 766, cert. denied, 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230; Safeway Stores, Inc. v. Combs, 5 Cir., 1960, 273 F.2d 295, 296. This is, of course, the reason why extra-judicial statements made during the course of and in furtherance of a conspiracy are not hearsay. See note 10, infra. But the circumstances here simply do not suggest any persuasive reason for treating as significant the mere fact that the statements were made.

9. Rent v. United States, 5 Cir., 1954, 209 F.2d 893, 899–900; Mackreth v. United States, 5 Cir., 1939, 103 F.2d 495, 496.

conspirator" exception by definition extends only to those statements made in furtherance of the conspiracy and during its pendency.[10] Adams' clandestine communiques to Petre were not in furtherance of the conspiracy. If anything they were in furtherance of a Federal investigation aiming toward the criminal prosecution of the conspirators. As such they clearly do not qualify as admissible declarations of a co-conspirator.

The soundness of this conclusion is demonstrated by supposing that Adams, rather than testifying, had decided to go on an extended vacation, thereby forcing the prosecution to rely on Petre's testimony to establish the existence and scope of the conspiracy. Petre would not have been permitted to repeat what Adams had reported to him, either on the untenable theory that Adams had been furthering the liquor conspiracy by telling a Federal agent about it or on the premise that what Adams reported was not being introduced to prove the truth of what he said but merely that he said it. United States v. Morello, 2 Cir., 1957, 250 F.2d 631, 634.

### Was It Prejudicial?

■ However, Adams was present and did testify, and for this reason alone we hold that the erroneous admission of Petre's testimony was not prejudicial error dictating reversal under F.R.Cr.P. 52(b). The question is not merely whether a mistake was made in applying the technical and sometimes arcane rules of evidence but whether that mistake resulted in prejudicial error clearly affecting the substantial rights of the accused.[11] We believe the error here was not in the least prejudicial because (i) Adams testified and was subjected to vigorous and thorough cross-examination and (ii) his testimony was in all material respects identical to Petre's.

■ This conclusion is reinforced by the fact that the general rule against the admission of hearsay testimony is in large part grounded upon the absence of an opportunity to cross-examine the out-of-court declarant and to confront him on the witness stand. See 5 Wigmore, Evidence (3d Ed.) § 1362. If hearsay is to be excluded mainly for those reasons, its introduction—despite its technical inadmissibility—is not necessarily prejudicial if the defendant is afforded the opportunity to challenge in court the person whose statements have been related. Cf. Dutton v. Evans, 1970, 400 U.S. 74, 91 S.Ct. 210, 219, 27 L.Ed.2d 213, 227; Bruton v. United States, 1968, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.

Moreover, Petre related nothing that was not subsequently brought out in the testimony of Adams. The jury learned no more about the conspiracy from the first witness (Petre) than they would have learned from the second witness (Adams) alone. Since the same circumstances were in fact revealed in either event, the defendants could not have been harmed by their premature revelation simply because Petre's testimony was technically inadmissible.

As a matter of fact, the only reason appellants suggest for holding Petre's testimony to be prejudicial is that it allegedly served to bolster the credibility of Adams as a witness. But there is no necessary or even rational relationship between the credibility of Adams' testimony and that of Petre. While Petre's testimony should not have been admitted, it clearly did not have the prejudicial effect demanded for reversal under Rule 52(b).

10. Paoli v. United States, 1957, 352 U.S. 232, 237, 77 S.Ct. 294, 297, 1 L.Ed.2d 278, 283; Lutwak v. United States, 1952, 344 U.S. 604, 617, 73 S.Ct. 481, 488, 97 L.Ed. 593, 603; Holsen v. United States, 5 Cir., 1968, 392 F.2d 292; Mount v. United States, 5 Cir., 1964, 333 F.2d 39, cert. denied, 1964, 379 U.S. 900, 85 S.Ct. 188, 13 L.Ed.2d 175; Lott

v. United States, 5 Cir., 1956, 230 F.2d 915.

11. Rivers v. United States, 5 Cir., 1968, 400 F.2d 935, 939; Williamson v. United States, 5 Cir., 1964, 332 F.2d 123, 132–33; Roe v. United States, 5 Cir., 1963, 316 F.2d 617, 622; Townsend v. United States, 5 Cir., 1958, 253 F.2d 461, 466.

**592**

Moreover, there is virtually no possibility that the testimony with respect to the conspiracy count might have prejudiced the appellants' defense on the other substantive counts. Those convictions were based upon ample evidence wholly unrelated to that provided by Petre, and as a result the concurrent sentences imposed would have withstood assault even if the conspiracy conviction had not. Lance v. United States, 5 Cir., 1969, 409 F.2d 698, 699, cert. denied sub nom. Gooch v. United States, 395 U.S. 945, 89 S.Ct. 2017, 23 L.Ed.2d 463.

### The Charge to the Jury

Appellants' second contention is that the Trial Court's instructions permitted the jury to attribute to the defendants the acts and declarations of Adams, a non-conspirator, and that the failure to charge that neither of the defendants could be held responsible for Adams' acts and statements was prejudicial error. We think not.

In the first place, the testimony does not reveal any instances in which Adams made statements that could reasonably have been characterized as "in furtherance of" the conspiracy, so there can be no basis for contending that *Adams'* extra-judicial assertions were used as evidence to convict. For the most part Adams testified about what Hutcheson, Dryden and the other co-conspirators said, and of course those declarations were clearly admissible against the defendants.

However, an even more fundamental reason justifies the refusal to charge the jury that Adams' acts and declarations were not those of a co-conspirator. The testimony establishes almost beyond question that everything Adams said or did in connection with the conspiracy was said or done at the explicit direction and assent of Hutcheson, and from the evidence the jury might reasonably have concluded that Adams was working for, or with, the defendants as well. He was an employee whose sole duty was to pick up and deliver contraband liquor, never acting upon his own initiative but instead merely carrying out the instructions of the others as their agent. The agency relationship is, of course, itself the foundation for the rule that the acts and declarations of one conspirator are chargeable to the others. United States v. Nall, 5 Cir., 1971, 437 F.2d 1177, 1182. Even though Adams technically may not have been a co-conspirator because he lacked the requisite criminal intent, his acts were in every respect equivalent to those of a partner in crime, regardless of his motives, and the Trial Court correctly refused to charge that as a matter of law the jury could not consider them as such. United States v. DeSapio, 2 Cir., 1970, 435 F.2d 272, 282–83, cert. denied, 1971, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166; United States v. Geaney, 2 Cir., 1969, 417 F.2d 1116, 1121, cert. denied, 1970, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539.

Affirmed.