**A. C. PARK, Petitioner-Appellant,**

**v.**

**H. T. (Tommy) HUFF, Respondent-Appellee.**

**No. 73–1897.**

United States Court of Appeals, Fifth Circuit.

May 6, 1974.

Rehearing En Banc Granted June 17, 1974.

Wesley R. Asinof, Atlanta, Ga., for petitioner-appellant.

Tony H. Hight, Dist. Atty. Assoc., Arthur K. Bolton, Atty. Gen., Atlanta, Ga., Nat Hancock, Jefferson, Ga., for respondent-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

■ A. C. Park, the petitioner-appellant, was convicted in a Georgia court of murdering a local prosecuting attorney. The evidence against him consisted of hearsay statements introduced under Georgia's co-conspirator exception to the hearsay rule. After his conviction was affirmed by the Georgia Supreme Court, Park sought federal habeas corpus relief. The district court denied Park's petition. The hearsay testimony introduced against Park was "crucial" and "devastating" under Dutton v. Evans, 1970, 400 U.S. 74, 87, 91 S.Ct. 210, 27 L.Ed.2d 213; it was unreliable; and the State made no showing that the declarants were unavailable to testify at trial. The introduction of the hearsay testimony, therefore, violated the accused's sixth amendment right of confrontation. We reverse.

**I.**

Between 7:00 and 7:30 in the morning on August 7, 1967, Floyd Hoard, the Solicitor General of the Piedmont Judicial Circuit in Georgia, was killed when dynamite wired to the ignition system of his car exploded. After a four-month investigation, a grand jury in Jackson County, Georgia, indicted five persons for the murder: Douglas Pinion, J. H. Blackwell, Loyd George Seay, George Ira Worley, and Park. The prosecution's theory was that the killing had been accomplished through a three-tiered conspiracy—Blackwell, Seay, and Worley had purchased the dynamite and wired it to the coil of Hoard's car; Pinion had paid the three $5,500 for the murder;

and Park had been the prime mover of the project and had furnished at least $5,000 of the purchase price. As a motive for the killing, the State postulated Hoard's recent law-enforcement activities against Park, Pinion, and Seay, who were operating on a large scale the business of selling liquor in a dry county. Hoard had had Park's home and an adjacent building raided, had instituted padlock proceedings against Park, had confiscated a great quantity of illegal alcohol, and had filed criminal charges against Park. Park had paid fines totalling $6,300. Park, Pinion, and Seay had been engaged in their illegal liquor business for many years. There was testimony that Pinion acted as Park's "enforcer" and that he used guns and administered beatings in the prosecution of their illicit business. On the day of his death Hoard had planned to present evidence against the liquor conspiracy to a grand jury.

Seay and Blackwell pleaded guilty to murder; Pinion and Worley were convicted of murder after trial. All were sentenced to life imprisonment. Park entered a plea of not guilty and was tried separately. He denied any knowledge of the murder and stated to the jury that he had not seen or talked with Seay for at least two years before Hoard's death.

Worley and Pinion did not testify at Park's trial. Blackwell and Seay testified for the State [1]. Blackwell's testimony was largely corroborative; he had never seen nor talked with Park. But Seay's testimony was determinative. Indeed, the only evidence directly implicating Park in the slaying came from Seay's lips. Seay related several critical conversations he had had with other alleged members of the conspiracy. The testimony most damaging to Park were out-of-court declarations by Pinion. According to Seay, Pinion told him that "a man" wanted Hoard "done away with"

---

1. The State offered to recommend that Blackwell receive a life sentence, provided that he would testify "fully, fairly, and completely". Whether or not Seay received a similar offer for his testimony is not clear. Park v. State, 1968, 224 Ga. 467, 469, 162 S.E.2d 359, 362, cert. denied, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441.

and was willing to pay $5,000. Seay responded that he would "check around for him and see if anybody wanted to do it". Seay spoke to Worley who said he would murder Hoard, but he wanted $7,500 instead of $5,000. Seay then went back to Pinion and told him that he had found someone to do the job for $7,500. Pinion responded that he did not think "the man" would pay more than $5,000, but that he would inquire. Pinion left and was gone about forty-five minutes. When he returned he told Seay, "[T]he old man won't go up any more. I will put $500 on it. Make it $5,500." It was established at trial that Park was generally known in the community as the "old man". The only other evidence directly implicating Park in the murder scheme was Seay's testimony that Worley had said that, if Seay did not go through with the killing, the "old man" would have "something done" to him or to his family [2]. Seay testified that "other than what Doug Pinion told" him he knew nothing as to Park's "having any connection with" the money given him by Pinion, and other than that "he had no contact with Mr. Park at all with respect to any killing".

. Park was found guilty and sentenced to death. The Georgia Supreme Court reversed, because Park had been improperly deprived of his right to make the opening and closing argument to the jury [3].

At Park's second trial the State called Blackwell as a witness. He refused to be examined on any matter, stating, "I stand on the Fifth Amendment". His sworn testimony at the original trial was read to the jury. An agent of the Georgia Bureau of Investigation, testifying for the State, related the contents of a confession Blackwell had given to him. The statement did not refer, even inferentially, to Park.

Seay was also again called as a witness for the State. After stating his name and place of incarceration, he refused to answer further questions, relying on his fifth amendment privilege against self incrimination. Over Park's objection, the State read to the jury the transcript of Seay's testimony at the first trial. Later, Seay was recalled to the witness stand, and on direct examination he repeated his testimony concerning his conversations with Pinion and Worley [4]. Seay's testimony with regard to these critical conversations was introduced a third time through an agent of the Georgia Bureau of Investigation, who related the content of Seay's confession to him. Neither Pinion nor Worley was called as a witness. Park was again convicted and sentenced to death, and this time the Georgia Supreme Court affirmed [5]. The United States Supreme Court, without ruling on the merits, vacated the judgment insofar as it left undisturbed the death penalty

2. Seay also testified that Pinion had told him after the murder that the "old man" was worried and had asked him who had participated in the murder. Park, however, might have been worried and curious to know who had participated without necessarily having been a party to the conspiracy to murder Hoard.

3. The Georgia Code, § 27–2201 provides:
   "After the testimony shall have been closed on both sides, the State's counsel shall open and conclude the argument to the jury, except that, if the defendant shall introduce no testimony, his counsel shall open and conclude after the testimony on the part of the State is closed."
   The trial court denied opening and closing arguments to Park because, in making an unsworn statement denying any connection

with the homicide, he referred to and displayed several documents. The Georgia Supreme Court held that a defendant does not lose his right to make opening and closing argument by exhibiting documents without formally introducing them in evidence. Park v. State, 162 S.E.2d 368.

4. In his live testimony at the second trial Seay related that Pinion had said he was going to inquire from the "old man", not the "man", whether the $5,000 figure could be increased. Seay did not mention in this testimony Pinion's alleged statement after the murder concerning Park's question about who had participated in the slaying. See note 2 supra.

5. Park v. State, 1969, 225 Ga. 618, 170 S.E. 2d 687.

imposed, and directed further proceedings consistent with Stewart v. Massachusetts, 1972, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 [6]. Park was resentenced to a life term [7]. He then filed in the district court a petition for a writ of habeas corpus. The court denied his petition. Park appeals, contending that his right to confrontation was violated by the introduction into evidence of the inculpatory hearsay statements Seay attributed to Pinion and Worley [8].

## II.

"Hearsay" is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted". Federal Rules of Evidence, Rule 801 (1972). Most definitions are substantially similar. See United States v. Williamson, 5 Cir. 1971, 450 F.2d 585, 589, cert. denied, 405 U.S. 1026, 92 S.Ct. 1297, 31 L.Ed.2d 486; ALI, Model Code of Evidence, Rule 501; McCormick, Law of Evidence § 246 (2d ed. 1972); 5 Wigmore, Evidence § 1361 (3d ed. 1940); 6 *id.* § 1766. Taking these definitions literally, the statements of Pinion and Worley, recounted by Seay, were analogous to but not identical with typical hearsay in that they were not "offered to prove the truth of the matter asserted"; whether in fact the "old man" would raise the ante or would have "something done" to Seay's family if he did not cooperate was beside the point. The out-of-court statements of Pinion and Worley, however, clearly implied that Park was involved in the conspiracy to murder Solicitor General Hoard. As proof of Park's guilt the statements formed evidence just as damaging as direct declarations that Park was a leading member of the murder conspiracy. And the truth of the implication depended on the credibility, the trustworthiness, of the declarants who were not subject to cross-examination. See Favre v. Henderson, 5 Cir. 1972, 464 F.2d 359, 362, cert. denied, 409 U.S. 942, 93 S.Ct. 235, 34 L.Ed.2d 193. Twenty-five years ago, Professor Morgan analyzed the hearsay rule and identified its rationale as based on the untrustworthiness of hearsay statements: "[S]hould we not recognize that the rational basis for the hearsay classification is not the formula, 'assertions offered for the truth of the matter asserted,' but rather the presence of substantial risks of insincerity and faulty narration, memory, and perception?" Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 218 (1948).[9]

Implied assertions may in certain circumstances carry less danger of insincerity or untrustworthiness than direct assertions, see United States v. Pacelli, 2 Cir. 1974, 491 F.2d 1108 at 1116, but not always. The danger of insincerity or untrustworthiness is decreased only where there is no possibility that the declarant intended to leave a particular impression. Finman, Implied Assertions as Hearsay: Some Criticisms of the Uniform Rules of Evidence, 14 Stan.L.Rev. 682, 686 (1962); Rucker, The Twilight Zone of Hearsay, 9 Vand.L.Rev. 453, 478 (1956). Here we cannot exclude that possibility [10]; Pinion's and Worley's

---

6. Park v. Georgia, 1972, 408 U.S. 935, 92 S.Ct. 2845, 33 L.Ed.2d 749.

7. Sullivan v. State, 1972, 229 Ga. 731, 194 S.E.2d 410.

8. Park also maintains that the Georgia trial court committed error by admitting the transcript of testimony given at the first trial and by permitting the agent of the Georgia Bureau of Investigation to relate the substance of a confession given by an alleged co-conspirator out of Park's presence. We do not reach these issues.

9. Morgan has of course no doubt as to his answer:

   "[I]n any attempt to define the limits of hearsay, or to determine the advisability of creating exceptions to the rule excluding it, attention should be directed chiefly to the dangers which, in the class of cases under consideration, an opportunity to cross-examine might enable the adversary to eliminate."

   Morgan, Hearsay and Non-Hearsay, 48 Harv.L.Rev. 1138, 1138–39 (1935).

10. See pp. 931–932 infra.

statements carry the implication that they mentioned the "old man" to Seay with the intention of communicating to him, as a fact, Park's participation in the plot.

When the possibility is real that an out-of-court statement which implies the existence of the ultimate fact in issue was made with assertive intent, it is essential that the statement be treated as hearsay if a direct declaration of that fact would be so treated. Baron Parke made an observation to that effect more than a century ago in the famous case of Wright v. Tatham, 1837, 7 Adolphus & E. 313, 388–389, 112 Eng.Rep. 488, 516–17:

> "[P]roof of a particular fact, which is not of itself a matter in issue, but which is relevant only as implying a statement or opinion of a third person on the matter in issue, is inadmissible in all cases where such a statement or opinion not on oath would be of itself inadmissible".

Were the rule otherwise, the hearsay rule could easily be circumvented through clever questioning and coaching of witnesses, so that answers were framed as implied rather than as direct assertions. The federal courts have consistently considered such implied assertions to be hearsay. See Krulewitch v. United States, 1949, 336 U.S. 440, 442, 69 S.Ct. 716, 93 L.Ed. 790; United States v. Pacelli, 491 F.2d at 1116–1117; Favre v. Henderson, 464 F.2d at 362; United States v. Williamson, 450 F.2d at 590. Georgia treats implied assertions similarly. When the Georgia Supreme Court considered the issue in the two *Park* cases, the Court assumed that Seay's testimony as to Pinion's and Worley's statements was hearsay.

### III.

Classified as hearsay, Seay's recitation of his conversations with Pinion and Worley was admitted into evidence under Georgia's co-conspirator exception to the hearsay rule.[11] The Georgia Code provides that "[a]fter the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." Ga. Code Ann. § 38–306. Georgia courts have interpreted the co-conspirator exception to permit the introduction of hearsay statements made after the alleged co-conspirators have been arrested and the sole continuing object of the conspiracy is to avoid punishment. See, e. g., Evans v. State, 1966, 222 Ga. 392, 399, 150 S.E.2d 240, 248, cert. denied, 385 U.S. 953, 87 S.Ct. 336, 17 L.Ed.2d 231; Carter v. State, 1809, 106 Ga. 372, 376, 32 S.E. 345, 347. Before such evidence may be admitted, however, Georgia requires that the conspiracy and the defendant's participation in it be proved by evidence independent of the hearsay testimony. Lanier v. State, 1939, 187 Ga. 534, 542–543, 1 S.E.2d 405, 410. There was no independent, non-hearsay evidence of Park's participation in the plot to kill Solicitor General Hoard; there was independent evidence only of Park's participation in a conspiracy to violate the State's alcoholic beverage law. The Georgia Supreme Court combined the two conspiracies. The conspiracy to murder Hoard, the court found, was in furtherance of the liquor conspiracy; the hearsay testimony against Park was therefore admissible. Park v. State, 1968, 224 Ga. 467, 474–475, 162 S.E.2d 359, 365, cert. denied, 393 U.S. 980, 89 S.Ct. 449, 21 L.Ed.2d 441.

That Seay's testimony was admissible under Georgia's co-conspirator exception does not, however, assure that the testimony was properly admissible when viewed against the constitutional standard of the confrontation clause of the sixth amendment. "[P]roper admission of evidence under an exception to the hearsay rule does not relieve a federal court considering a state criminal conviction from the responsibility for

---

11. For a discussion of the various rationales behind the co-conspirator exception, see Developments in the Law—Criminal Conspiracy, 72 Harv.L.Rev. 920, 988–89 (1959).

reviewing all the facts of the case in light of governing federal constitutional principles." Phillips v. Neil, 6 Cir. 1971, 452 F.2d 337, 345, cert. denied, 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141. In California v. Green, 1970, 339 U.S. 149, 155–156, 90 S.Ct. 1930, 26 L.Ed.2d 489, and Dutton v. Evans, 1970, 400 U.S. 74, 81–82, 91 S.Ct. 210, 27 L.Ed.2d 213, the Supreme Court emphasized that the hearsay rule and the confrontation clause are not congruent.[12] See also Favre v. Henderson, 464 F.2d at 363.

Testimony may be introduced in violation of the hearsay rule without violating the accused's right of confrontation, and testimony introduced under a traditional state exception to its hearsay rule may run afoul of the constitutional provision. The lesson is a plain one: whereas a state's hearsay rule and its exceptions may be administered by rote, the confrontation clause is responsive to the real and varying needs of the trial process. As Justice Stewart observed in Dutton:

> "The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' California v. Green, 399 U.S. at 161, 90 S.Ct. at 1936, 26 L. Ed.2d at 499."

400 U.S. at 89.

The appellee urges us to compare Seay's hearsay testimony with the federal co-conspirator exception, implying that if we found Seay's testimony admissible under the federal rule, our analysis would need to proceed no further. The thrust of this suggestion is that the federal hearsay rule and its exceptions provide a constitutionally acceptable minimum protection to the accused under the confrontation clause and that only testimony which falls outside the federal boundaries need be examined more closely under Green and Dutton. For this proposition the appellee relies on language in the plurality opinion in Dutton: "Appellee does not challenge and we do not question the validity of the coconspirator exception applied in the federal courts." 400 U.S. at 80. It is true, as the appellee here points out, that the First Circuit has read that language as a statement that evidence admitted in federal court under the federal co-conspirator exception automatically complies with the requirements of the confrontation clause. See Ottomano v. United States, 1 Cir. 1972, 468 F.2d 269, 273, cert. denied, 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260; United States v. Clayton, 1 Cir. 1971, 450 F.2d 16, 20, cert. denied, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250. But the Second Circuit has recently rejected that interpretation of Dutton. See United States v. Puco, 2 Cir. 1973, 476 F.2d 1099, rehearing en banc denied, id. at 1111, cert. denied, 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82. Although the other circuits, including our own, have continued to apply the federal co-conspirator exception, none has unequivocally decided whether evidence introduced under the exception may in certain circumstances violate the confrontation clause.[13]

12. The confrontation clause of the sixth amendment is applied to the states through the fourteenth. Pointer v. Texas, 1965, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923. "The refusal to equate the sixth amendment with the hearsay rule thus applies equally to federal and state prosecutions." United States v. Cerone, 7 Cir. 1971, 452 F.2d 274, 283, cert. denied, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240.

13. The Tenth Circuit has stated, after Dutton but apparently without considering Dutton, that evidence introduced under the federal co-conspirator exception does not violate the confrontation clause. United States v. Cox, 10 Cir. 1971, 449 F.2d 679, cert. denied, 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136. It is not clear that Cox should be considered post-Dutton; the Court cited this Court's opinion in Evans v. Dutton, 5 Cir., 400 F.2d 828, without noting that it had been reversed by the Supreme Court. The Ninth Circuit has conflicting decisions. Compare United States v. Adams, 9 Cir. 1971, 446 F.2d 681, cert. denied, 404 U.S.

We do not view this as the proper occasion to throw the weight of this circuit on one side or the other of the debate. Even if we were to endorse the First Circuit's analysis, it is not at all clear that the hearsay testimony introduced in this case would have been properly admitted under the federal co-conspirator exception. The federal exception applies to declarations of co-conspirators made during and in furtherance of the conspiracy when the conspiracy and the defendant's participation are proved by independent evidence. See Federal Rules of Evidence, Rule 801(d)(2)(E) (1972); 3 Wharton's Criminal Evidence § 642 (13 ed. 1973). The Supreme Court has pointed out that the federal exception applies only to declarations made in furtherance of the "main aim" of the conspiracy and, unlike the Georgia rule, does not extend to the concealment stage where the aim is "preventing detection and punishment". Krulewitch v. United States, 336 U.S. at 444. Even under the State's theory, the murder would appear to have been geared more toward protecting the participants in the liquor conspiracy from prosecution that toward furthering illegal liquor sales. Moreover, it is questionable whether Park's participation in the murder conspiracy would properly be considered established by independent evidence under the federal exception. The only conspiracy in which Park's participation was independently proved was the illicit liquor conspiracy, and the ties between the liquor and the murder conspiracies were not tight; at best the conspiracies were related by an overlap of membership (Pinion and Seay) and motive.

■ In any event, whether the testimony would be admissible under the federal rule is not the proper inquiry. To place Seay's testimony against the wooden framework of the elements of the federal exception, and to have affirmance or reversal of Park's conviction depend on the fit, would remove the analysis twice over from the real issue, the "accuracy of the truth-determining process." Dutton v. Evans, 400 U.S. at 89. *Dutton* and *Green* clearly indicate that, at least where the state's co-conspirator exception is more expansive than the federal, the proper approach for federal courts on habeas corpus review of a state criminal conviction is to consider on a case-by-case basis whether the testimony meets the more general tests of reliability outlined in those opinions.

The Court endorsed a case-by-case approach in *Dutton*. In that case the respondent, Evans, was tried in a Georgia court for the murder of three police officers. Part of the evidence against him was the hearsay testimony of a cellmate of one of his co-defendants. The witness related that when Evans' co-defendant returned from his arraignment, he stated: "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." The declaration, concededly made during the concealment phase of the criminal venture, was admitted as evidence, and its admission was upheld by the Georgia Supreme Court under the Georgia co-conspirator exception to the hearsay rule. When the

---

943, 92 S.Ct. 294, 30 L.Ed.2d 257, and United States v. Nunez, 9 Cir. 1973, 483 F.2d 453, with United States v. Everidge, 9 Cir. 1973, 488 F.2d 1. We brushed the question in Hoover v. Beto, 5 Cir. 1972, 467 F.2d 516, cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673, when a majority of this Court, en banc, held that the hearsay introduction of an oral confession pursuant to Texas' rule permitting the introduction of the confession of a principal at the trial of an accomplice for the purpose of proving the guilt of the principal does not violate the sixth amendment. Although this Court stated baldly, "Neither the Sixth nor the Fourteenth Amendment is violated when hearsay evidence is admitted in accordance with recognized exceptions to the hearsay rule", *id.,* 467 F.2d at 533, the Court went on to say: "Where hearsay evidence is admitted, the record must affirmatively show those indicia of the statement's reliability and trustworthiness which in turn serve as adequate substitutes for the right of cross-examination." *Id.* After noting that the Texas exception was "well-recognized", the en banc Court examined the "indicia of reliability" present in the case.

case worked its way up through federal habeas corpus proceedings, the Supreme Court upheld Evans' conviction.[14] The Court emphasized, however, that it was not thereby placing its imprimatur on all applications of the Georgia rule. Writing for the plurality, Justice Stewart observed: "The Georgia statute can obviously have many applications consistent with the Confrontation Clause, and we conclude that its application *in the circumstances of this case* did not violate the Constitution." 400 U.S. at 87–88 (emphasis supplied). See Favre v. Henderson, 464 F.2d at 363–364; Phillips v. Neil, 452 F.2d at 345.

■ The proper test by which to measure state hearsay exceptions under confrontation-clause attack has been variously stated. (1) Does the trier of fact have "a satisfactory basis for evaluating the truth of the prior statement"? California v. Green, 399 U.S. at 161, quoted in *Dutton*, 400 U.S. at 89. (2) How "real" is the possibility that cross examination "could conceivably have shown the jury that the statement, though made, might have been unreliable"? Dutton v. Evans, 400 U.S. at 89. (3) What "indicia of reliability" were present to permit the testimony to be placed before the jury although there was no confrontation of the declarant? *Id.* Each of these queries amounts to the same thing; each is an articulation of a search for trustworthiness and accuracy. Although the Supreme Court has not thereby provided precise standards by which to test the constitutionality of the admission of testimony under state hearsay exceptions,[15] by bracketing the target if not by a direct hit, the Court has made its meaning clear enough to convince us that we must overturn Park's conviction in this case. "[S]trict compliance with the confrontation clause —presenting the statement whose truth is at issue under oath, in the presence of the trier of fact and the defendant, and

subject to cross-examination—provides the required 'satisfactory basis' " for admission of hearsay. The Supreme Court, 1970 Term, 85 Harv.L.Rev. 40, 191 (1971).

Commentators have frequently noted the inherent unreliability of hearsay statements implicating an alleged co-conspirator in the conspiracy, for example:

> "The invocation of a name may be gratuitous, may be deliberately false in order to gain advantages for the declarant greater than those that would flow from naming a real participant or none at all, may be a cover for concealment purposes . . . ., or may represent an effort to gain some personal revenge."

Davenport, The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis, 85 Harv.L.Rev. 1378, 1396 (1972). See also Levie, Hearsay and Conspiracy, 52 Mich.L.Rev. 1159, 1165–66 (1954); Comment, The Hearsay Exception for Co-Conspirators' Declarations, 25 U.Chi.L.Rev. 530, 540, 541 (1958); Note, Preserving the Right to Confrontation, 113 U.Pa.L.Rev. 741, 756 (1965). On the record in this case, Seay's statement implicating Park in the plot to kill Hoard is the kind of testimony that illustrates well the wisdom of these perceptions.

■ Pinion had substantial motive to fabricate the involvement of the "old man" in the conspiracy. By implying to Seay that Park was behind the conspiracy, Pinion could add the "old man's" prestige to the undertaking and perhaps bolster Seay's hope that the plot was well-conceived and that the chances of apprehension were slim. In addition, by implying that Park was the source of the capital, Pinion could avoid further pressure to add to the pot. (I. e., "You know that if it were up to me, I would give you more, but my hands are tied".[16]) To be sure, through cross-ex-

---

14. Justice Stewart wrote the opinion for the plurality of four Justices. Justice Harlan wrote a separate concurring opinion.

15. See United States v. Clayton, 450 F.2d at 20.

16. In fact, according to Seay, Pinion stated that he was adding $500 to the amount the "old man" was willing to pay.

amination before the jury Park's attorney was able to test Seay's sincerity, memory, and perception. We accept the jury's obvious conclusion that Pinion actually made the statements Seay attributed to him. See Dutton v. Evans, 400 U.S. at 88. But Seay was not able to testify as to the truth of Pinion's crucial implication—that Park was the moving force behind the scheme. See Douglas v. Alabama, 1965, 380 U.S. 415, 420, 85 S.Ct. 1074, 13 L.Ed.2d 934. Indeed, Seay testified that he had no independent knowledge of Park's involvement. Permitting cross-examination of Seay as to what he heard Pinion say was not enough.

■■ Pinion's possible insincerity in implying Park's involvement in the conspiracy was not effectively counterbalanced by indicia of reliability. In *Dutton* the Court found present two of the most valuable indicia: the declarant's statement was spontaneous and against his penal interest. Here there were no such safeguards as to Pinion's sincerity. Pinion could have carefully contrived his reference to Park, and the reference to the "old man" was not against Pinion's penal interest.[17] There was no reason to suspect that Pinion's live testimony, and his cross-examination, would not have helped significantly to assure that the jury had "a satisfactory basis for evaluating the truth" of Pinion's statements. California v. Green, 399 U.S. at 161. Cross-examination is "the essential right secured by the Confrontation Clause". Douglas v. Alabama, 380 U.S. at 420.

The jury could similarly have profited from cross-examination of Worley concerning his statement that the "old man" would have "something done" to Seay or his family if he attempted to back out of the murder plot. First, Pinion may have been in league with Worley to fabricate Park's involvement, and, as with Pinion's conversation, there were no indicia of reliability reflecting on Worley's sincerity. Second, Worley's statement may have represented what Pinion told him or what he surmised from the fact that Pinion generally worked for Park. We find no hint in the record that Worley had personal knowledge that Park was involved. Compare Dutton v. Evans, 400 U.S. at 88. We believe that the source of Worley's opinion that Park was a member of the conspiracy to murder Hoard was essential to the jury's consideration of the statement. When Park was denied the opportunity to cross-examine Worley, he was denied his right of confrontation.

■ If the record reflected that Worley and Pinion were unavailable to testify at Park's trial, we would face a considerably different question. Necessity has long been one of the factors in confrontation clause analysis. In Mattox v. United States, 1894, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409, the petitioner had undergone a conviction, reversal, retrial, and reconviction. Two of the government's witnesses who testified at the first trial had died before the second. The reporter's notes of their original testimony were read to the jury at the second trial. In response to Mattox's sixth amendment challenge, the Court said: "[G]eneral rules . . ., however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case." 156 U.S. at 243. Permitting Mattox to go "scot free" simply because the witnesses providing the strongest proof against him were dead "would be carrying his constitutional protection to an unwarrantable extent". *Id.* Where declarants are unavailable to testify, federal courts have continued to balance the requirements of criminal prosecutions against the confrontation rights of defendants. "[T]here may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the de-

---

17. Although Pinion's statements, taken as a whole, were against his penal interest, the references to Park were not. To provide a meaningful guarantee of reliability, of course, it is necessary that the critical portions of the declarant's statements be against his penal interest. See Davenport, 85 Harv.L.Rev. at 1394.

mands of the confrontation clause where the witness is shown to be actually unavailable". Barber v. Page, 1968, 390 U. S. 719, 725–726, 88 S.Ct. 1318, 20 L.Ed. 2d 255. See also Phillips v. Neil, 452 F.2d at 348; United States v. Weber, 3 Cir. 1971, 437 F.2d 327, 336, cert. denied, 402 U.S. 932, 91 S.Ct. 1524, 28 L. Ed.2d 867. We too appreciate that the confrontation clause question is more difficult where there is a strong likelihood that, unless introduced in evidence as a hearsay exception, extrajudicial statements will be lost entirely. United States v. Weber, 437 F.2d at 336.

There is no evidence before us, however, that either Worley or Pinion was in fact unavailable to testify. The State concedes in its brief that both Worley and Pinion were serving life sentences in Georgia prisons at the time of Park's second trial.[18] Compare Mancusi v. Stubbs, 1972, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293. And there was no significant likelihood that either Worley or Pinion would have successfully refused to testify on Fifth Amendment grounds. Compare Hoover v. Beto, 5 Cir. 1972, 467 F.2d 516, 540 (en banc), cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673. One may fairly infer that the State did not call Pinion and Worley as witnesses simply because of an apprehension that they would exculpate Park on the stand, perhaps by denying that they ever made the state-

ments attributed to them, perhaps by testifying that they had invoked Park's name without factual basis. In other words, it appears that the State preferred to rely on Seay's hearsay recitation of conversations with Pinion and Worley primarily due to a fear that calling the actual declarants to the stand would hurt its case.[19]

We recognize that *Dutton* did not require the prosecutor to make a showing of why the declarant was not called to testify. Although the plurality did not expound on the matter, the answer seems to lie with two factors: the testimony carried strong indicia of reliability[20] and was neither "crucial" to the prosecution's case nor "devastating" to accused.[21] We have already discussed the unreliability of the co-conspirator declarations in this case. It is also clear to us that they were "crucial" and "devastating". The statements by Pinion and Worley formed the only evidence that linked Park directly to the murder. Without either statement the prosecution would have had no case; with only one the prosecution's case would have lacked corroboration and would have been severely weakened. That the statements were "devastating" to Park is obvious.[22]

Considerations of elemental fairness[23] and of the "accuracy of the truth determining process" demand that we prevent the substitution of devastating, unrelia-

18. Seay and Blackwell were also incarcerated at the time of Park's second trial. Their incarceration proved to be no insurmountable burden in producing them to testify.

19. See Phillips v. Neil, 452 F.2d at 347; Hoover v. Beto, 5 Cir. 1971, 439 F.2d 913, 924, rev'd on other grounds en banc, 1972, 467 F.2d 516, cert. denied, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673.

20. See also Mancusi v. Stubbs, 408 U.S. at 213.

21. The hearsay statement in *Dutton* was "of peripheral significance at most". 400 U.S. at 87. Evans was not just a co-conspirator; he fired the fatal shots. Twenty witnesses testified for the prosecution, including an eyewitness to the murders. The hearsay declaration was relatively harmless in that it was a conclusory statement by the declarant of his feelings toward the defendant. As is stated in the opinion: "The case does not involve evidence in any 'crucial' or 'devastat-

ing,' sense as did all the cases just discussed." *Id.*

22. Justice Harlan, concurring in *Dutton*, retreated from the view he expressed in *Green* that the essence of the confrontation clause is "availability" and that the prosecutor must produce all available witnesses rather than relying on hearsay testimony. See 399 U.S. at 174. Upon reconsideration, Harlan felt that a rule requiring production of available witnesses would "significantly curtail the development of the law of evidence to eliminate the necessity for production of declarants where production would be unduly inconvenient and of small utility to a defendant". 400 U.S. at 95–96. Harlan's concern for streamlining the judicial process is not at stake in this case. There is no evidence that production of Pinion and Worley would have been "unduly inconvenient". Clearly, it would not have been of "small utility" to Park.

23. See Davenport, 85 Harv.L.Rev. at 1403.

ble hearsay testimony for live testimony and an opportunity for cross-examination by the accused. The importance of cross-examination is in direct relation to the damaging quality of the hearsay. The prosecution may not hide a weak case behind a hearsay shield to obtain a conviction.[24] We hold that in the circumstances of this case, where the declarants were not shown to be unavailable and where their out-of-court statements were not supported by significant indicia of reliability and were "crucial" and "devastating", the accused was denied his sixth amendment right of confrontation when the declarants were not produced as witnesses by the State.

▇▇▇ That the defendant Park could have called Pinion and Worley as witnesses does not affect our holding. The burden of producing witnesses to meet the accused's right of confrontation falls on the State. The alternative of the defendant's calling the declarants was not an adequate substitute: On cross-examination the defendant has greater freedom in questioning a witness, such as the right to use leading questions; and the State can impeach the witness with evidence of prior crimes; repetition of the hearsay, on cross-examination by the State, will increase its impact. See Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 1, 195 (1971). We endorse the Seventh Circuit's view:

> "It seems to us . . . that where an extrajudicial declaration is used under circumstances such that the opportunity to cross-examine the declarant is essential to a defendant's right of confrontation, it must be the government's burden to produce the declarant. Mere availability, in the sense that the defendant could have subpoenaed him, does not, in our opinion, suffice."

Simmons v. United States, 7 Cir. 1971, 440 F.2d 890, 891. This Court has previously adopted a similar approach. In Hoover v. Beto, 5 Cir. 1971, 439 F.2d 913, rev'd on other grounds en banc, 1972, 467 F.2d 516, cert. denied, 409 U. S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673, the State introduced hearsay testimony of a principal's oral confession in the trial of an alleged accomplice. With regard to the State's argument that the defendant could have called the principal to the stand, the panel said:

> "The State did not call [the principal] Sellers as a witness, and it has failed to meet the requirements for applying California v. Green, *supra*. The inference to be drawn is that the State was apprehensive that Sellers would recant his confession or refuse to testify. The State evidently did not want to be in the position of introducing the confession by way of impeaching or rebutting Sellers' testimony. It preferred to introduce the confession in its case in chief and put the burden of rebuttal on the defense.
>
> That Sellers was available to be called as a witness does not mitigate the prosecution's misconduct here. The State sought to shift to the defendant the risk of calling Sellers to the stand. To accept the State's argument that the availability of Sellers is the equivalent of putting him on the stand and subjecting him to cross-examination would severely alter the presumptions of innocence and the burdens of proof which protect the accused. Hoover's undoubted right to call Sellers as a witness in his behalf cannot be substituted for his Sixth Amendment right to confront Sellers as a witness against him."

439 F.2d at 924.

Although the *Dutton* plurality opinion and Justice Harlan's concurring opinion include passing references in footnotes to the fact that the accused could have called the declarant to testify,[25] neither the plurality nor Justice Harlan relied on this fact in holding that the accused's constitutional rights were not violated.

---

24. One commentator has suggested that an "availability rule" be a canon of professional behavior. He notes: "The objection to the prosecutor's presentation of hearsay instead of an available witness is not that such hearsay necessarily is less reliable than the hearsay of an unavailable witness, but that the prosecutor has made the testimony less reliable than it might have been." Note, Confrontation and the Hearsay Rule, 75 Yale L.J. 1434 (1966). See also Read, The New Confrontation-Hearsay Dilemma, 45 S. Cal.L.Rev. 1, 49 (1972).

25. 400 U.S. at 88 n. 19, 96 n. 3.

More important, there was no evidence that by calling the declarant the accused would have sacrificed other significant trial weapons. In the case before us, if Park had called Pinion and Worley, the defendant apparently would have lost his right under Georgia law to make opening and closing argument before the jury.[26] In these circumstances we deem it particularly unwise to tinker with the rule that the prosecutor may not shift the burden of producing available witnesses to the accused.

Park's conviction must be vacated. Unless the State commences prosecution of the case within a reasonable time, the writ shall issue.

Reversed and remanded.

COLEMAN, Circuit Judge (dissenting):

I respectfully dissent.

Park has twice run the gauntlet of Georgia trials and appeals involving a particularly heinous form of murder.

The sole issue for us, as a federal habeas corpus court, is whether Park has been denied the right of confrontation guaranteed by the United States Constitution. The majority opinion analyzes the factual issues and the inferences reasonably to be drawn therefrom [ordinarily the function of the trial jury] and concludes that Park was unconstitutionally deprived of confrontation.

In many respects, I disagree with the factual analysis and I respectfully disagree with the legal conclusion.

I think the evidence very clearly establishes a motive for Park wishing to get rid of the prosecutor, who paid with his life for his desire to enforce the law against a locally powerful liquor ring. In my view, the motive matches the reprehensible event. We should not consider Park's activities as being somehow insulated or immutably partitioned off from each other. They were all part of a common fabric and they ought not to be thus dissipated unless we are to

rewrite the law of conspiracy so as to exclude statements of co-conspirators, made outside the presence and hearing of others jointly indicted and jointly prosecuted. I specifically point out that the statements attributed to Park were made before the murder, not afterwards, as in *Dutton*.

Accordingly, I do not agree with what is being done in this case.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

26. The Georgia Supreme Court considers the improper deprivation of a defendant's right to make opening and closing argument before the jury to require reversal of a conviction. See Park v. State, 162 S.E.2d at 368; note 3 *supra*.

