62109. ROBERTS v. THE STATE.
62110. JACKSON v. THE STATE.

POPE, Judge.

Appellants A. David Roberts and Robert E. Jackson were indicted on two counts of violating the Georgia Controlled Substances Act. One count involved possession of marijuana and the other count involved the possession of cocaine. Appellants were both convicted on each count and sentenced to 10 years on Count 1 and 15

years on Count 2.

On June 10, 1979 five men were arrested in Moultrie, Georgia where they were attempting to complete a drug transaction with undercover agents. The state contends appellants were a part of the conspiracy that resulted in the marijuana and cocaine being brought into Moultrie. Neither of the appellants was present when the arrests were made on June 10. The state's contention is based upon a series of failed illegal transactions which started almost a year and four months earlier. In February of 1978, France Mathis, one of the men arrested in Moultrie, met Colquitt County Deputy Sheriff Causey and Moultrie Police Lieutenant Boyd and discussed transporting drugs into Colquitt County by air. Mathis believe himself to be establishing a rapport with two "crooked cops." Although the officers had several meetings with Mathis during the remainder of 1978, "nothing ever happened."

It was in March of 1979 that things started "happening" and Lt. Boyd began to meet other men who expressed interest in a scheme involving plates for printing counterfeit money. On March 5 Lt. Boyd, Dep. Causey, France Mathis, and one of the appellants, David Roberts, met and discussed the counterfeiting operation. Thereafter, these men along with a man named McGlon held several meetings planning a caper involving counterfeit money and drugs. Appellant Roberts supposedly worked for appellant Jackson; however, Jackson never appeared at the meetings attended by the officers.

On the last day of March, after it appeared that the counterfeit money deal was falling through, Mathis began to arrange a drug deal with Lt. Boyd. The transaction was to take place at the Holiday Inn at Sarasota, Florida. Lt. Boyd received assistance from Florida law enforcement agents who posed as buyers. Mathis and Roberts met with Lt. Boyd and Dep. Causey at another Holiday Inn in Florida on April 3 and 4. These meetings were to finalize the deal. Telephone records indicated that several calls were placed to Sarasota from appellant Jackson's business phone during the first two weeks in April. In the end, after all the undercover buyers were set up and everything appeared to be in order, the Sarasota deal was unsuccessful since no drugs were delivered.

On April 16, after the Sarasota episode, Mathis and McGlon discussed the previously unsuccessful deal with Lt. Boyd and Dep. Causey. The last time appellant Roberts was present at a meeting was on the first of May. The meeting was at Mathis' home and McGlon was also present. Lt. Boyd and Mathis discussed a drug transaction to take place on May 3 at Moultrie. The May 3 deal was unsuccessful. After being put off with stories of delays, the undercover agents from Florida left and Lt. Boyd went to Atlanta. Lt. Boyd heard nothing for

three weeks and then, on May 29, Mathis called him. The two of them arranged a drug sale to be carried out in Moultrie. Lt. Boyd was proceeding with the understanding that the deal was being set up by a man called "Larry." Mathis' statement that "the same bunch" was involved led Lt. Boyd to believe that appellants were a part of the conspiracy. From June 1 until the June 10 arrests, Lt. Boyd and Dep. Causey had several meetings with Mathis in order to make final preparations for the transfer of money for drugs. On June 10 the Florida undercover agents were set up in a motel in Moultrie together with Lt. Boyd and other local law enforcement officers.

Lt. Boyd was newly acquainted with all of those arrested in connection with the drug transaction except Mathis. No evidence was offered to show that any of those arrested, except Mathis, had even a remote connection with appellants or the previously unsuccessful transactions.

1. Appellants contend the admissible evidence presented at trial was insufficient for any rational trier of fact to have found the essential elements to convict them of possession of marijuana and cocaine beyond a reasonable doubt. Appellants agree that there was sufficient evidence to prove their involvement in a conspiracy to deliver drugs to Sarasota, Florida. This conspiracy resulted in several unsuccessful attempts to transfer drugs and counterfeit money. Appellants argue, however, that this conspiracy was completely unrelated and not connected with the scheme that resulted in drugs being brought to Moultrie on June 10. The latter illegal activity had its inception on May 29 when Mathis called Lt. Boyd after a period when no deals had been discussed. Appellants strongly urge that the state failed to connect them with independent evidence to any conspiracy relating to the drug importation into Moultrie in June.

The state maintains that only one conspiracy existed and that the Moultrie transaction did not have its inception on May 29 as claimed by appellants, but was the fruition of all the plans and schemes of the appellants, Mathis, McGlon, and others for the past several months. The state urges that the evidence as a whole leads to the conclusion that appellants Jackson and Roberts were a part of the conspiracy that planned the June 10 transaction.

Most of the facts relied upon by the state relate to the unsuccessful counterfeit deal and the equally unsuccessful drug transaction in Sarasota, Florida. Both appellants admit the evidence was sufficient to show their involvement with Mathis in these projects. During these unsuccessful transactions, Roberts was involved in each phase. He was present at one final discussion on May 1. That discussion resulted in yet another unsuccessful delivery

between May 3 and 8.

After May 1 there is no evidence aliunde the declarations of alleged co-conspirators that would link either of the appellants to the drug transaction occurring on June 10. The drugs were not delivered pursuant to the May 1 meeting and communications between the officers and any of the co-conspirators ceased following the failed drug transaction for three weeks. When Mathis resurfaced, a host of new characters emerged. The state relied only upon declarations of co-conspirators to connect appellants with the June drug deal. Lt. Boyd testified that on May 29, Mathis told him that "all of us, the same bunch" were in on the new deal and on June 9 Mathis allegedly told Boyd again that appellants were "in it." Appellants contend the trial court erred and should not have admitted the co-conspirators' declarations into evidence to show appellants' involvement in the Moultrie affair. Code Ann. § 38-306 provides: "After the fact of the conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." Thus, before the declarations of co-conspirators can be admissible as an exception to the hearsay rule, a prima facie case of conspiracy must be "proved by evidence aliunde such declarations." *Park v. State,* 224 Ga. 467, 474 (162 SE2d 359) (1968). There was no competent evidence to prove appellants involvement in the conspiracy and thus the declarations of the conspirators linking appellants with the crime would be "hearsay testimony and without probative value." *Smith v. State,* 230 Ga. 876, 879 (199 SE2d 793) (1973).

There is no independent evidence that the initial conspiracy continued beyond the unsuccessful attempts in early May. In fact, the three week break in May was uncharacteristic of the parties in light of the activities of the preceding months. The May 29 phone call to Boyd by Mathis can also be noted for the conspicuous absence of Roberts from its content. There is no independent evidence that the appellants participated, either actively or as conspirators, in the June 10 Moultrie transaction. The evidence was insufficient to show a single conspiracy or to link appellants to the June 10 transaction. The statutory exception to the hearsay rule of co-conspirator's declarations is inapplicable absent proof of a party's involvement in a conspiracy and the trial court erred in admitting such declarations against appellants. *Smith,* supra. Accordingly, the judgment must be reversed. It is unnecessary to address the remaining enumerations of error.

*Judgment reversed. Quillian, C. J., Shulman, P. J., Carley and Sognier, JJ., concur. Deen, P. J., McMurray, P. J., Banke and Birdsong, JJ., dissent.*

DECIDED NOVEMBER 17, 1981 —
REHEARING DENIED DECEMBER 14, 1981.

*Larkin M. Fowler, Jr., William C. McCalley,* for appellant (case no. 62109).

*Emory Walters, H. J. Altman,* for appellant (case no. 62110).

*H. Lamar Cole, District Attorney,* for appellee.

McMURRAY, Presiding Judge, dissenting.

The defendants here were indicted, along with two others, for the offenses of violation of the Georgia Controlled Substances Act (marijuana possession as to Count 1 and cocaine possession as to Count 2). Only these two defendants have been tried, other alleged conspirators having pleaded guilty.

The charges arise out of a "drug bust" occurring in Moultrie, Georgia, in which the contraband in question was seized during an attempted sale of marijuana and cocaine to buyers who were in fact undercover agents. Subsequent to the conviction of those involved in the purported sale to the undercover agents a second indictment was returned against four defendants as parties to the crime and as conspirators in the events leading to its commission. The case may be characterized as "the Florida connection" with reference to certain attempted criminal activities of acquiring, selling and transporting counterfeit money and the sale of illegal drugs in the State of Georgia, originating in the State of Florida. The criminal activities involved contacts with two Georgia officers believed by the would-be drug sellers to be "crooked cops" in which an attempt was made to bribe the officers to bring drugs into Colquitt County at Spence Field. Thereafter, the counterfeit money, as well as the drugs, became the subject of ongoing meetings and discussions involving certain parties with the undercover agents posing as criminals. After the first negotiation with them concerning smuggling marijuana into Moultrie the criminal activity did not materialize. Defendant Jackson is characterized here by the circumstantial evidence as "The Man" and "Big Man 'Ed,'" the man with the money to bankroll the criminal activity, or to obtain same from others. Defendant Roberts was the employee of defendant Jackson, that is, he acted for and on behalf of Jackson in the fabric of this drug and counterfeit money activity. Neither defendant Roberts nor defendant Jackson ever appear in the State of Georgia with reference to the ongoing conspiracy but are connected to same by the entwining revelations of the various witnesses including the testimony of the "crooked cops." Various and sundry persons entered into the conspiratorial group and then withdrew, but the "crooked cops," another defendant and

these defendants were actively involved for the entire three months period with reference to possible crimes and the actual crime which finally occurred. As to the counterfeiting, defendant Jackson was to bankroll the money, to obtain same and defendant Roberts had contact with the people who were printing the money, worked for Jackson for many years and had done many things for him and could be completely trusted by him. Several of the illegal activities, including the bogus money scheme, entirely fizzled, but at all times there was an ongoing scheme with reference to the purchase and sale of tons of marijuana which were to be paid for by the "Big Man." I consider the conspiracy evidence sufficient to authorize the jury to convict these two defendants as being actively concerned in the commission of the crime by causing the other conspirators to commit the crime by aiding, abetting, hiring and counseling and procuring others to commit same. See Code Ann. § 26-801 (Ga. L. 1968, pp. 1249, 1271).

I, therefore, respectfully dissent and would affirm the trial court. I am authorized to state that Presiding Judge Deen, Judge Banke and Judge Birdsong join in this dissent.